DURO *v.* REINA, CHIEF OF POLICE, SALT RIVER
DEPARTMENT OF PUBLIC SAFETY, SALT RIVER
PIMA-MARICOPA INDIAN COMMUNITY, ET AL.

No. 88–6546.   Argued November 29, 1989—Decided May 29, 1990

· KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, which MARSHALL, J., joined, *post*, p. 698.

*John Trebon*, by appointment of the Court, 490 U. S. 1079, argued the cause and filed briefs for petitioner.

*Richard B. Wilks* argued the cause for respondents. With him on the brief was *M. J. Mirkin*.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Stewart, Harriet S. Shapiro, Robert L. Klarquist, Edward J. Shawaker, William G. Lavell,* and *Scott Keep.**

---

*Briefs of *amici curiae* urging affirmance were filed for the Three Affiliated Tribes of the Fort Berthold Reservation et al. by *Charles A. Hobbs;* and for the Sac and Fox Nation et al. by *G. William Rice.*

Briefs of *amici curiae* were filed for the Rosebud Sioux Tribe et al. by *Jerilyn DeCoteau* and *Robert T. Anderson;* and for the Salt River Project Agricultural Improvement and Power District by *John B. Weldon, Jr.,* and *Stephen E. Crofton.*

JUSTICE KENNEDY delivered the opinion of the Court.

We address in this case whether an Indian tribe may assert criminal jurisdiction over a defendant who is an Indian but not a tribal member. We hold that the retained sovereignty of the tribe as a political and social organization to govern its own affairs does not include the authority to impose criminal sanctions against a citizen outside its own membership.

I

The events giving rise to this jurisdictional dispute occurred on the Salt River Indian Reservation. The reservation was authorized by statute in 1859, and established by Executive Order of President Hayes in 1879. It occupies some 49,200 acres just east of Scottsdale, Arizona, below the McDowell Mountains. The reservation is the home of the Salt River Pima-Maricopa Indian Community, a recognized Tribe with an enrolled membership. Petitioner in this case, Albert Duro, is an enrolled member of another Indian Tribe, the Torres-Martinez Band of Cahuilla Mission Indians. Petitioner is not eligible for membership in the Pima-Maricopa Tribe. As a nonmember, he is not entitled to vote in Pima-Maricopa elections, to hold tribal office, or to serve on tribal juries. Salt River Pima–Maricopa Indian Community Code of Ordinances §§ 3–1, 3–2, 5–40, App. 55–59.

Petitioner has lived most of his life in his native State of California, outside any Indian reservation. Between March and June 1984, he resided on the Salt River Reservation with a Pima-Maricopa woman friend. He worked for the PiCopa Construction Company, which is owned by the Tribe.

On June 15, 1984, petitioner allegedly shot and killed a 14-year-old boy within the Salt River Reservation boundaries. The victim was a member of the Gila River Indian Tribe of Arizona, a separate Tribe that occupies a separate reservation. A complaint was filed in United States District Court charging petitioner with murder and aiding and abetting

murder in violation of 18 U. S. C. §§2, 1111, and 1153.[1] Federal agents arrested petitioner in California, but the federal indictment was later dismissed without prejudice on the motion of the United States Attorney.

---

[1] Jurisdiction in "Indian country," which is defined in 18 U. S. C. § 1151, see *United States* v. *John*, 437 U. S. 634, 648–649 (1978), is governed by a complex patchwork of federal, state, and tribal law. For enumerated major felonies, such as murder, rape, assault, and robbery, federal jurisdiction over crimes committed by an Indian is provided by 18 U. S. C. § 1153, commonly known as the Indian Major Crimes Act, which, as amended in 1986, states:

"(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

"(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive juridiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense."

It remains an open question whether jurisdiction under § 1153 over crimes committed by Indian tribe members is exclusive of tribal jurisdiction. See *United States* v. *Wheeler*, 435 U. S. 313, 325, n. 22 (1978).

Another federal statute, the Indian Country Crimes Act, 18 U. S. C. § 1152, applies the general laws of the United States to crimes committed in Indian country:

"Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country."

The general law of the United States may assimilate state law in the absence of an applicable federal statute. 18 U. S. C. § 13. Section 1152 also contains the following exemptions:

"This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the

Petitioner then was placed in the custody of Pima-Maricopa officers, and he was taken to stand trial in the Pima-Maricopa Indian Community Court. The tribal court's powers are regulated by a federal statute, which at that time limited tribal criminal penalties to six months' imprisonment and a $500 fine. 25 U. S. C. § 1302(7) (1982 ed.). The tribal criminal code is therefore confined to misdemeanors.[2] Petitioner was charged with the illegal firing of a weapon on the reservation. After the tribal court denied petitioner's motion to dismiss the prosecution for lack of jurisdiction, he filed a peti-

---

local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

For Indian country crimes involving only non-Indians, longstanding precedents of this Court hold that state courts have exclusive jurisdiction despite the terms of § 1152. See *New York ex rel. Ray* v. *Martin*, 326 U. S. 496 (1946); *United States* v. *McBratney*, 104 U. S. 621 (1882). Certain States may also assume jurisdiction over Indian country crime with the consent of the affected tribe pursuant to Pub. L. 280, Act of Aug. 15, 1953, ch. 505, 67 Stat. 588 (codified, as amended, at 18 U. S. C. § 1162, 28 U. S. C. § 1360) and the Indian Civil Rights Act of 1968, Pub. L. 90–284, Tit. IV, 82 Stat. 78 (codified at 25 U. S. C. §§ 1321–1328).

The final source of criminal jurisdiction in Indian country is the retained sovereignty of the tribes themselves. It is undisputed that the tribes retain jurisdiction over their members, subject to the question of exclusive jurisdiction under § 1153 mentioned above. See *United States* v. *Wheeler*, *supra*. The extent of tribal jurisdiction over nonmembers is at issue here. For a scholarly discussion of Indian country jurisdiction, see Clinton, Criminal Jurisdiction Over Indian Lands: A Journey Through a Jurisdictional Maze, 18 Ariz. L. Rev. 505 (1976).

[2] Title II of the Indian Civil Rights Act of 1968, 82 Stat. 77, codified at 25 U. S. C. §§ 1301–1303, imposes certain protections and limitations on the exercise of tribal authority. Under a 1986 amendment to the Act, the limit on tribal court criminal punishment is now set at one year's imprisonment and a $5,000 fine. The Act also provides protections similar, though not identical, to those contained in the Bill of Rights, which does not apply to the tribes, see *Talton* v. *Mayes*, 163 U. S. 376 (1896). For information about the Salt River Tribal Court and the courts of other tribes, see National American Indian Court Judges Association, Native American Tribal Court Profiles (1984).

tion for a writ of habeas corpus in the United States District Court for the District of Arizona, naming the tribal chief judge and police chief as respondents.

The District Court granted the writ, holding that assertion of jurisdiction by the Tribe over an Indian who was not a member would violate the equal protection guarantees of the Indian Civil Rights Act of 1968, 25 U. S. C. § 1301 *et seq.* Under this Court's holding in *Oliphant* v. *Suquamish Indian Tribe,* 435 U. S. 191 (1978), tribal courts have no criminal jurisdiction over non-Indians. The District Court reasoned that, in light of this limitation, to subject a nonmember Indian to tribal jurisdiction where non-Indians are exempt would constitute discrimination based on race. The court held that respondents failed to articulate a valid reason for the difference in treatment under either rational-basis or strict-scrutiny standards, noting that nonmember Indians have no greater right to participation in tribal government than non-Indians, and no lesser fear of discrimination in a court system that bars the participation of their peers.

A divided panel of the Court of Appeals for the Ninth Circuit reversed. 821 F. 2d 1358 (1987). Both the panel opinion and the dissent were later revised. 851 F. 2d 1136 (1988). The Court of Appeals examined our opinion in *United States* v. *Wheeler,* 435 U. S. 313 (1978), decided 16 days after *Oliphant,* a case involving a member prosecuted by his Tribe in which we stated that tribes do not possess criminal jurisdiction over "nonmembers." The Court of Appeals concluded that the distinction drawn between members and nonmembers of a tribe throughout our *Wheeler* opinion was "indiscriminate," and that the court should give "little weight to these casual references." 851 F. 2d, at 1140–1141. The court also found the historical record "equivocal" on the question of tribal jurisdiction over nonmembers.

The Court of Appeals then examined the federal criminal statutes applicable to Indian country. See 18 U. S. C. §§ 1151–1153. Finding that references to "Indians" in those

statutes and the cases construing them applied to all Indians, without respect to their particular tribal membership, the court concluded that "if Congress had intended to divest tribal courts of criminal jurisdiction over nonmember Indians they would have done so." The tribes, it held, retain jurisdiction over minor crimes committed by Indians against other Indians "without regard to tribal membership." 851 F. 2d, at 1143.

The Court of Appeals rejected petitioner's equal protection argument under the Indian Civil Rights Act of 1968. It found no racial classification in subjecting petitioner to tribal jurisdiction that could not be asserted over a non-Indian. Instead, it justified tribal jurisdiction over petitioner by his significant contacts with the Pima-Maricopa Community, such as residing with a member of the Tribe on the reservation and his employment with the Tribe's construction company. The need for effective law enforcement on the reservation provided a rational basis for the classification. *Id.*, at 1145.

As a final basis for its result, the panel said that failure to recognize tribal jurisdiction over petitioner would create a "jurisdictional void." To treat petitioner as a non-Indian for jurisdictional purposes would thwart the exercise of federal criminal jurisdiction over the misdemeanor because, as the court saw it, the relevant federal criminal statute would not apply to this case due to an exception for crimes committed "by one Indian against the person or property of another Indian." See 18 U. S. C. § 1152. This would leave the crime subject only to the state authorities, which had made no effort to prosecute petitioner, and might lack the power to do so. 851 F. 2d, at 1145–1146.

Judge Sneed dissented, arguing that this Court's opinions limit the criminal jurisdiction of an Indian tribe to its members, and that Congress has given the Tribe no criminal jurisdiction over nonmembers. He reasoned that the federal criminal statutes need not be construed to create a jurisdic-

tional void, and stressed that recognition of jurisdiction here would place the nonmember Indian, unlike any other citizen, in jeopardy of trial by an alien tribunal. *Id.*, at 1146–1151. These views were reiterated by three other Ninth Circuit judges in a dissent from denial of rehearing en banc. 860 F. 2d 1463 (1988). The dissenters accepted petitioner's contention that tribal jurisdiction subjected him to an impermissible racial classification and to a tribunal with the potential for bias.

Between the first and second sets of opinions from the Ninth Circuit panel, the Eighth Circuit held that tribal courts do not possess inherent criminal jurisdiction over persons not members of the tribe. *Greywater* v. *Joshua*, 846 F. 2d 486 (1988). Due to the timing of the opinions, both the Eighth Circuit and the Ninth Circuit in this case had the benefit of the other's analysis but rejected it. We granted certiorari to resolve the conflict, 490 U. S. 1034 (1989), and now reverse.

## II

Our decisions in *Oliphant* and *Wheeler* provide the analytic framework for resolution of this dispute. *Oliphant* established that the inherent sovereignty of the Indian tribes does not extend to criminal jurisdiction over non-Indians who commit crimes on the reservation. *Wheeler* reaffirmed the longstanding recognition of tribal jurisdiction over crimes committed by tribe members. The case before us is at the intersection of these two precedents, for here the defendant is an Indian, but not a member of the Tribe that asserts jurisdiction. As in *Oliphant*, the tribal officials do not claim jurisdiction under an affirmative congressional authorization or treaty provision, and petitioner does not contend that Congress has legislated to remove jurisdiction from the tribes. The question we must answer is whether the sovereignty retained by the tribes in their dependent status within our scheme of government includes the power of criminal jurisdiction over nonmembers.

We think the rationale of our decisions in *Oliphant* and *Wheeler*, as well as subsequent cases, compels the conclusion that Indian tribes lack jurisdiction over persons who are not tribe members. Our discussion of tribal sovereignty in *Wheeler* bears most directly on this case. We were consistent in describing retained tribal sovereignty over the defendant in terms of a tribe's power over its *members*. Indeed, our opinion in *Wheeler* stated that the tribes "cannot try nonmembers in tribal courts." 435 U. S., at 326. Literal application of that statement to these facts would bring this case to an end. Yet respondents and *amici*, including the United States, argue forcefully that this statement in *Wheeler* cannot be taken as a statement of the law, for the party before the Court in *Wheeler* was a member of the Tribe.

It is true that *Wheeler* presented no occasion for a holding on the present facts. But the double jeopardy question in *Wheeler* demanded an examination of the nature of retained tribal power. We held that jurisdiction over a Navajo defendant by a Navajo court was part of retained tribal sovereignty, not a delegation of authority from the Federal Government. It followed that a federal prosecution of the same offense after a tribal conviction did not involve two prosecutions by the same sovereign, and therefore did not violate the Double Jeopardy Clause. Our analysis of tribal power was directed to the tribes' status as limited sovereigns, necessarily subject to the overriding authority of the United States, yet retaining necessary powers of internal self-governance. We recognized that the "sovereignty that the Indian tribes retain is of a unique and limited character." *Id.*, at 323.

A basic attribute of full territorial sovereignty is the power to enforce laws against all who come within the sovereign's territory, whether citizens or aliens. *Oliphant* recognized that the tribes can no longer be described as sovereigns in this sense. Rather, as our discussion in *Wheeler* reveals, the retained sovereignty of the tribes is that needed to control their own internal relations, and to preserve their own

unique customs and social order. The power of a tribe to prescribe and enforce rules of conduct for its own members "does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status. The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe." 435 U. S., at 326. As we further described the distinction:

> "[T]he dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe. . . . [T]hey are not such powers as would necessarily be lost by virtue of a tribe's dependent status." *Ibid.*

Our finding that the tribal prosecution of the defendant in *Wheeler* was by a sovereign other than the United States rested on the premise that the prosecution was a part of the tribe's *internal* self-governance. Had the prosecution been a manifestation of external relations between the Tribe and outsiders, such power would have been inconsistent with the Tribe's dependent status, and could only have come to the Tribe by delegation from Congress, subject to the constraints of the Constitution.

The distinction between members and nonmembers and its relation to self-governance is recognized in other areas of Indian law. Exemption from state taxation for residents of a reservation, for example, is determined by tribal membership, not by reference to Indians as a general class. We have held that States may not impose certain taxes on transactions of tribal members on the reservation because this would interfere with internal governance and self-determination. See *Moe* v. *Confederated Salish & Kootenai Tribes*, 425 U. S. 463 (1976); *McClanahan* v. *Arizona Tax*

*Comm'n,* 411 U. S. 164 (1973). But this rationale does not apply to taxation of nonmembers, even where they are Indians:

> "Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation. There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements." *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134, 161 (1980).

Similarly, in *Montana* v. *United States,* 450 U. S. 544 (1981), we held that the Crow Tribe could regulate hunting and fishing by nonmembers on land held by the Tribe or held in trust for the Tribe by the United States. But this power could not extend to nonmembers' activities on land they held in fee. Again we relied upon the view of tribal sovereignty set forth in *Oliphant:*

> "Though *Oliphant* only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U. S., at 565 (footnote omitted).

It is true that our decisions recognize broader retained tribal powers outside the criminal context. Tribal courts, for example, resolve civil disputes involving nonmembers, including non-Indians. See, *e. g., Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 65–66 (1978); *Williams* v. *Lee,* 358 U. S. 217, 223 (1959); F. Cohen, Handbook of Federal Indian Law 253 (1982 ed.) (hereafter Cohen) ("The development of principles governing civil jurisdiction in Indian country has been markedly different from the development of rules dealing

with criminal jurisdiction"). Civil authority may also be present in areas such as zoning where the exercise of tribal authority is vital to the maintenance of tribal integrity and self-determination. See, *e. g.*, *Brendale* v. *Confederated Tribes and Bands of Yakima Indian Nation*, 492 U. S. 408 (1989). As distinct from criminal prosecution, this civil authority typically involves situations arising from property ownership within the reservation or "consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana* v. *United States, supra,* at 565. The exercise of criminal jurisdiction subjects a person not only to the adjudicatory power of the tribunal, but also to the prosecuting power of the tribe, and involves a far more direct intrusion on personal liberties.

The tribes are, to be sure, "a good deal more than 'private voluntary organizations,'" and are aptly described as "unique aggregations possessing attributes of sovereignty over both their members and their territory." *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975). In the area of criminal enforcement, however, tribal power does not extend beyond internal relations among members. Petitioner is not a member of the Pima-Maricopa Tribe, and is not now eligible to become one. Neither he nor other members of his Tribe may vote, hold office, or serve on a jury under Pima-Maricopa authority. Cf. *Oliphant*, 435 U. S., at 194, and n. 4. For purposes of criminal jurisdiction, petitioner's relations with this Tribe are the same as the non-Indian's in *Oliphant*. We hold that the Tribe's powers over him are subject to the same limitations.

## III

Respondents and *amici* argue that a review of history requires the assertion of jurisdiction here. We disagree. The historical record in this case is somewhat less illuminating than in *Oliphant*, but tends to support the conclusion we

reach. Early evidence concerning tribal jurisdiction over nonmembers is lacking because "[u]ntil the middle of this century, few Indian tribes maintained any semblance of a formal court system. Offenses by one Indian against another were usually handled by social and religious pressure and not by formal judicial processes; emphasis was on restitution rather than punishment." *Oliphant, supra,* at 197. Cases challenging the jurisdiction of modern tribal courts are few, perhaps because "most parties acquiesce to tribal jurisdiction" where it is asserted. See National American Indian Court Judges Association, Indian Courts and the Future 48 (1978). We have no occasion in this case to address the effect of a formal acquiescence to tribal jurisdiction that might be made, for example, in return for a tribe's agreement not to exercise its power to exclude an offender from tribal lands, see *infra,* at 696–697.

Respondents rely for their historical argument upon evidence that definitions of "Indian" in federal statutes and programs apply to all Indians without respect to membership in a particular tribe. For example, the federal jurisdictional statutes applicable to Indian country use the general term "Indian." See 18 U. S. C. §§ 1152–1153. In construing such a term in the Act of June 30, 1834, ch. 161, 4 Stat. 733, this Court stated that it "does not speak of members of a tribe, but of the race generally,—of the family of Indians." *United States* v. *Rogers,* 4 How. 567, 573 (1846). Respondents also emphasize that courts of Indian offenses, which were established by regulation in 1883 by the Department of the Interior and continue to operate today on reservations without tribal courts, possess jurisdiction over *all* Indian offenders within the relevant reservation. See 25 CFR § 11.2(a) (1989).

This evidence does not stand for the proposition respondents advance. Congressional and administrative provisions such as those cited above reflect the Government's treatment of Indians as a single large class with respect to *federal* juris-

diction and programs. Those references are not dispositive of a question of *tribal* power to treat Indians by the same broad classification. In *Colville*, we noted the fallacy of reliance upon the fact that member and nonmember Indians may both be "Indians" under a federal definition as proof of federal intent that inherent tribal power must affect them equally:

> "[T]he mere fact that nonmembers resident on the reservation come within the definition of 'Indian' for purposes of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U. S. C. § 479, does not demonstrate a congressional intent to exempt such Indians from State taxation." 447 U. S., at 161.

Similarly, here, respondents' review of the history of *federal* provisions does not sustain their claim of *tribal* power.

We did note in *Wheeler* that federal statutes showed Congress had recognized and declined to disturb the traditional and "undisputed" power of the tribes over members. 435 U. S., at 324–325. But for the novel and disputed issue in the case before us, the statutes reflect at most the tendency of past Indian policy to treat Indians as an undifferentiated class. The historical record prior to the creation of modern tribal courts shows little federal attention to the individual tribes' powers as between themselves or over one another's members. Scholars who do find treaties or other sources illuminating have only divided in their conclusions. Compare Comment, Jurisdiction Over Nonmember Indians on Reservations, 1980 Ariz. S. L. J. 727, 740 (treaties suggest lack of jurisdiction over nonmembers), with Note, Who is an Indian?: *Duro* v. *Reina*'s Examination of Tribal Sovereignty and Criminal Jurisdiction over Nonmember Indians, 1988 B. Y. U. L. Rev. 161, 170–171 (treaties suggest retention of jurisdiction over nonmembers).

The brief history of the tribal courts themselves provides somewhat clearer guidance. The tribal courts were established under the auspices of the Indian Reorganization Act

of 1934, ch. 576, 48 Stat. 984, codified at 25 U. S. C. §§ 461–479. The 60 years preceding the Act had witnessed a calculated policy favoring elimination of tribal institutions, sale of tribal lands, and assimilation of Indians as individuals into the dominant culture. Many Indian leaders and others fought to preserve tribal integrity, however, and the 1930's saw a move toward toleration of Indian self-determination. See generally Cohen 127–153; S. Tyler, A History of Indian Policy 70–150 (1973); A. Debo, A History of the Indians of the United States 201–300 (1970).

The Indian Reorganization Act allowed the expression of retained tribal sovereignty by authorizing creation of new tribal governments, constitutions, and courts. The new tribal courts supplanted the federal courts of Indian offenses operated by the Bureau of Indian Affairs. Significantly, new law and order codes were required to be approved by the Secretary of the Interior. See 25 U. S. C. § 476. The opinions of the Solicitor of the Department of the Interior on the new tribal codes leave unquestioned the authority of the tribe over its members.

Evidence on criminal jurisdiction over nonmembers is less clear, but on balance supports the view that inherent tribal jurisdiction extends to tribe members only. One opinion flatly declares that "[i]nherent rights of self government may be invoked to justify punishment of members of the tribe but not of non members." 1 Op. Solicitor of Dept. of Interior Relating to Indian Affairs 1917–1974 (Op. Sol.), p. 699 (Nov. 17, 1936). But this opinion refers to an earlier opinion that speaks in broad terms of jurisdiction over Indians generally. 55 I. D. 14, 1 Op. Sol. 445 (Oct. 25, 1934). Another opinion disapproved a tribal ordinance covering all Indians on the ground that the tribal constitution embraced only members. The Solicitor suggested two alternative remedies, amendment of the tribal constitution and delegation of federal authority from the Secretary. 1 Op. Sol. 736 (Mar. 17, 1937). One of these options would reflect a belief that tribes possess

inherent sovereignty over nonmembers, while the other would indicate its absence. Two later opinions, however, give a strong indication that the new tribal courts were not understood to possess power over nonmembers. One mentions only adoption of nonmembers into the tribe or receipt of delegated authority as means of acquiring jurisdiction over nonmember Indians. 1 Op. Sol. 849 (Aug. 26, 1938). A final opinion states more forcefully that the only means by which a tribe could deal with interloping nonmember Indians were removal of the offenders from the reservation or acceptance of delegated authority. 1 Op. Sol. 872 (Feb. 17, 1939).

These opinions provide the most specific historical evidence on the question before us and, we think, support our conclusion. Taken together with the general history preceding the creation of modern tribal courts, they indicate that the tribal courts embody only the powers of *internal* self-governance we have described. We are not persuaded that external criminal jurisdiction is an accepted part of the courts' function.

## IV

Whatever might be said of the historical record, we must view it in light of petitioner's status as a citizen of the United States. Many Indians became citizens during the era of allotment and tribal termination around the turn of the century, and all were made citizens in 1924. See Cohen 142–143 (tracing history of Indian citizenship). That Indians are citizens does not alter the Federal Government's broad authority to legislate with respect to enrolled Indians as a class, whether to impose burdens or benefits. See *United States* v. *Antelope*, 430 U. S. 641 (1977); *Morton* v. *Mancari*, 417 U. S. 535 (1974). In the absence of such legislation, however, Indians like other citizens are embraced within our Nation's "great solicitude that its citizens be protected . . . from unwarranted intrusions on their personal liberty." *Oliphant*, 435 U. S., at 210.

Criminal trial and punishment is so serious an intrusion on personal liberty that its exercise over non-Indian citizens was a power necessarily surrendered by the tribes in their submission to the overriding sovereignty of the United States. *Ibid.* We hesitate to adopt a view of tribal sovereignty that would single out another group of citizens, nonmember Indians, for trial by political bodies that do not include them. As full citizens, Indians share in the territorial and political sovereignty of the United States. The retained sovereignty of the tribe is but a recognition of certain additional authority the tribes maintain over Indians who consent to be tribal members. Indians like all other citizens share allegiance to the overriding sovereign, the United States. A tribe's additional authority comes from the consent of its members, and so in the criminal sphere membership marks the bounds of tribal authority.

The special nature of the tribunals at issue makes a focus on consent and the protections of citizenship most appropriate. While modern tribal courts include many familiar features of the judicial process, they are influenced by the unique customs, languages, and usages of the tribes they serve. Tribal courts are often "subordinate to the political branches of tribal governments," and their legal methods may depend on "unspoken practices and norms." Cohen 334–335. It is significant that the Bill of Rights does not apply to Indian tribal governments. *Talton* v. *Mayes,* 163 U. S. 376 (1896). The Indian Civil Rights Act of 1968 provides some statutory guarantees of fair procedure, but these guarantees are not equivalent to their constitutional counterparts. There is, for example, no right under the Act to appointed counsel for those unable to afford a lawyer. See 25 U. S. C. § 1302(6).

Our cases suggest constitutional limitations even on the ability of Congress to subject American citizens to criminal proceedings before a tribunal that does not provide constitutional protections as a matter of right. Cf. *Reid* v. *Covert,*

354 U. S. 1 (1957). We have approved delegation to an Indian tribe of the authority to promulgate rules that may be enforced by criminal sanction in *federal* court, *United States* v. *Mazurie*, 419 U. S. 544 (1975), but no delegation of authority to a tribe has to date included the power to punish nonmembers in *tribal* court. We decline to produce such a result through recognition of inherent tribal authority.

Tribal authority over members, who are also citizens, is not subject to these objections. Retained criminal jurisdiction over members is accepted by our precedents and justified by the voluntary character of tribal membership and the concomitant right of participation in a tribal government, the authority of which rests on consent. This principle finds support in our cases decided under provisions that predate the present federal jurisdictional statutes. We held in *United States* v. *Rogers*, 4 How. 567 (1846), that a non-Indian could not, through his adoption into the Cherokee Tribe, bring himself within the federal definition of "Indian" for purposes of an exemption to a federal jurisdictional provision. But we recognized that a non-Indian could, by adoption, "become entitled to certain privileges in the tribe, and make himself amenable to their laws and usages." *Id.*, at 573; see *Nofire* v. *United States*, 164 U. S. 657 (1897).

With respect to such internal laws and usages, the tribes are left with broad freedom not enjoyed by any other governmental authority in this country. See, *e. g.*, *Santa Clara Pueblo* v. *Martinez*, 436 U. S., at 56, and n. 7 (noting that Bill of Rights is inapplicable to tribes, and holding that the Indian Civil Rights Act of 1968 does not give rise to a federal cause of action against the tribe for violations of its provisions). This is all the more reason to reject an extension of tribal authority over those who have not given the consent of the governed that provides a fundamental basis for power within our constitutional system. See *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 172–173 (1982) (STEVENS, J., dissenting).

The United States suggests that Pima-Maricopa tribal jurisdiction is appropriate because petitioner's enrollment in the Torres-Martinez Band of Cahuilla Mission Indians "is a sufficient indication of his self-identification as an Indian, with traditional Indian cultural values, to make it reasonable to subject him to the tribal court system, which . . . implements traditional Indian values and customs." Brief for United States as *Amicus Curiae* 27. But the tribes are not mere fungible groups of homogenous persons among whom any Indian would feel at home. On the contrary, wide variations in customs, art, language, and physical characteristics separate the tribes, and their history has been marked by both intertribal alliances and animosities. See generally Smithsonian Institution, Handbook of North American Indians (1983); H. Driver, Indians of North America (1961); L. Spier, Yuman Tribes of the Gila River (1933). Petitioner's general status as an Indian says little about his consent to the exercise of authority over him by a particular tribe.

The Court of Appeals sought to address some of these concerns by adopting a "contacts" test to determine which nonmember Indians might be subject to tribal jurisdiction. But the rationale of the test would apply to non-Indians on the reservation as readily as to Indian nonmembers. Many non-Indians reside on reservations, and have close ties to tribes through marriage or long employment. Indeed, the population of non-Indians on reservations generally is greater than the population of all Indians, both members and nonmembers, and non-Indians make up some 35% of the Salt River Reservation population. See U. S. Dept of Commerce, Bureau of Census, Supplementary Report, American Indian Areas and Alaska Native Villages: 1980 Census of Population 16–19. The contacts approach is little more than a variation of the argument that any person who enters an Indian community should be deemed to have given implied consent to tribal criminal jurisdiction over him. We have rejected this approach for non-Indians. It is a logical consequence of that

decision that nonmembers, who share relevant jurisdictional characteristics of non-Indians, should share the same jurisdictional status.

V

Respondents and *amici* contend that without tribal jurisdiction over minor offenses committed by nonmember Indians, no authority will have jurisdiction over such offenders. They assert that unless we affirm jurisdiction in this case, the tribes will lack important power to preserve order on the reservation, and nonmember Indians will be able to violate the law with impunity.[3] Although the jurisdiction at stake here is over relatively minor crimes, we recognize that protection of the community from disturbances of the peace and other misdemeanors is a most serious matter. But this same interest in tribal law enforcement is applicable to non-Indian reservation residents, whose numbers are often greater. It was argued in *Oliphant* that the absence of tribal jurisdiction over non-Indians would leave a practical, if not legal, void in reservation law enforcement. See Brief for Respondent in *Oliphant* v. *Suquamish Indian Tribe*, O. T. 1977, No. 76–5729. The argument that only tribal jurisdiction could meet the need for effective law enforcement did not provide a basis for finding jurisdiction in *Oliphant;* neither is it sufficient here.

For felonies such as the murder alleged in this case at the outset, federal jurisdiction is in place under the Indian Major Crimes Act, 18 U. S. C. § 1153. The tribes also possess their traditional and undisputed power to exclude persons whom they deem to be undesirable from tribal lands. See *Brendale* v. *Confederated Tribes and Bands of Yakima Indian Nation*, 492 U. S., at 422. *New Mexico* v. *Mescalero*

---

[3] We note that a jurisdictional void would remain under the approach of the court below. Affording tribal court jurisdiction over Indians with a sufficient level of contacts to the reservation would presumably leave Indians visiting or passing through the reservation outside the tribe's jurisdiction.

*Apache Tribe,* 462 U. S. 324, 333 (1983); *Worcester* v. *Georgia,* 6 Pet. 515, 561 (1832); Cohen 252. Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them. Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities.

Respondents' major objection to this last point is that, in the circumstances presented here, there may not be any lawful authority to punish the nonmember Indian. State authorities may lack the power, resources, or inclination to deal with reservation crime. Arizona, for example, specifically disclaims jurisdiction over Indian country crimes. Ariz. Const., Art. 20, ¶ 4. And federal authority over minor crime, otherwise provided by the Indian Country Crimes Act, 18 U. S. C. § 1152, may be lacking altogether in the case of crime committed by a nonmember Indian against another Indian, since § 1152 states that general federal jurisdiction over Indian country crime "shall not extend to offenses committed by one Indian against the person or property of another Indian."

Our decision today does not imply endorsement of the theory of a jurisdictional void presented by respondents and the court below. States may, with the consent of the tribes, assist in maintaining order on the reservation by punishing minor crime. Congress has provided a mechanism by which the States now without jurisdiction in Indian country may assume criminal jurisdiction through Pub. L. 280, see n. 1, *supra.* Our decision here also does not address the ability of neighboring tribal governments that share law enforcement concerns to enter into reciprocal agreements giving each jurisdiction over the other's members. As to federal jurisdiction under § 1152, both academic commentators and the dissenting judge below have suggested that the statute could be construed to cover the conduct here. See 851 F. 2d, at 1150–

1151 (Sneed, J., dissenting); 1980 Ariz. S. L. J., at 743–745. Others have disagreed. That statute is not before us and we express no views on the question.

If the present jurisdictional scheme proves insufficient to meet the practical needs of reservation law enforcement, then the proper body to address the problem is Congress, which has the ultimate authority over Indian affairs. We cannot, however, accept these arguments of policy as a basis for finding tribal jurisdiction that is inconsistent with precedent, history, and the equal treatment of Native American citizens. The judgment of the Court of Appeals is hereby

*Reversed.*

JUSTICE BRENNAN with whom JUSTICE MARSHALL joins, dissenting.

The Court today holds that an Indian tribal court has no power to exercise criminal jurisdiction over a defendant who is an Indian but not a tribal member. The Court concedes that Indian tribes never expressly relinquished such power. Instead, the Court maintains that tribes *implicitly* surrendered the power to enforce their criminal laws against nonmember Indians when the tribes became dependent on the Federal Government. Because I do not share such a parsimonious view of the sovereignty retained by Indian tribes, I respectfully dissent.

I

The powers of Indian tribes are *"'inherent powers of a limited sovereignty which has never been extinguished.'"* *United States* v. *Wheeler,* 435 U. S. 313, 322 (1978) (quoting F. Cohen, Handbook of Federal Indian Law 122 (1945) (emphasis in original)). When the tribes were incorporated into the territory of the United States and accepted the protection of the Federal Government, they necessarily lost some of the sovereign powers they had previously exercised. In *Wheeler,* we explained:

"The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." 435 U. S., at 323 (citations omitted).

By becoming "domestic dependent nations," Indian tribes were divested of any power to determine their external relations. See *id.*, at 326. Tribes, therefore, have no inherent power to enter into direct diplomatic or commercial relations with foreign nations. See *Worcester* v. *Georgia*, 6 Pet. 515, 559–560 (1832); *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17–18 (1831). In addition, Indian tribes may not alienate freely the land they occupy to non-Indians. See *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 667–668 (1974); *Johnson* v. *McIntosh*, 8 Wheat. 543, 604 (1823). A tribe is implicitly divested of powers to have external relations because they are *necessarily* inconsistent with the overriding interest of the greater sovereign. See *Brendale* v. *Confederated Tribes and Bands of Yakima Indian Nation*, 492 U. S. 408, 451 (1989) (BLACKMUN, J., dissenting).

By contrast, we have recognized that tribes did not "surrender [their] independence—[the] right to self-government, by associating with a stronger [power], and taking its protection." *Worcester, supra*, at 560–561. Tribes have retained "the powers of self-government, including the power to prescribe and enforce internal criminal laws." *Wheeler, supra*, at 326. I agree with the Court that "[a] basic attribute of full territorial sovereignty is the power to enforce laws against all who come within the sovereign's territory, whether citizens or aliens." *Ante*, at 685. I disagree with the Court that *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191, 212 (1978), "recognized that the tribes can no longer be described

as sovereigns in this sense." *Ante,* at 685. In *Oliphant,* the Court held that tribes did not have the power to exercise criminal jurisdiction over *non-Indians* because such power was inconsistent with the overriding national interest. But it does not follow that because tribes lost their power to exercise criminal jurisdiction over non-Indians, they also lost their power to enforce criminal laws against Indians who are not members of their tribe.

## A

In *Oliphant,* the Court did not point to any statutes or treaties *expressly* withdrawing tribal power to exercise criminal jurisdiction over nonmembers, but instead held that the tribe was *implicitly* divested of such power. The Court today appears to read *Oliphant* as holding that the exercise of criminal jurisdiction over anyone but members of the tribe is inconsistent with the tribe's dependent status. See *ante,* at 686.[1] But *Oliphant* established no such broad principle.

---

[1] The Court also contends that a "[l]iteral application" of *United States* v. *Wheeler,* 435 U. S. 313 (1978), would bring this case to an end, for *Wheeler* states that "tribes 'cannot try nonmembers in tribal courts.'" *Ante,* at 685 (quoting *Wheeler, supra,* at 326). In *Wheeler,* the Court held that the Double Jeopardy Clause was not violated by successive prosecution of a tribal member in a tribal court and then in a federal court because the prosecutions were conducted by different sovereigns. In answering the double jeopardy question, the Court was required to consider the source of tribal power to punish its own members, and the Court unequivocally stated that the power to punish members was part of the tribe's retained sovereignty. 435 U. S., at 326. The statement quoted above, however, amounts to nothing more than an inaccurate description of the holding in *Oliphant.* 435 U. S., at 326 (citing *Oliphant* v. *Suquamish Indian Tribe,* 435 U. S. 191 (1978)). Moreover, given that the defendant in *Wheeler* was a *member* of the Tribe that tried him, the discussion of tribal power over nonmembers, also quoted by the Court today, *ante,* at 686, was dictum.

In transmuting this dictum into law, the Court relies on language from *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134, 161 (1980), stating that nonmembers "'stand on the same footing as non-Indians resident on the reservation.'" *Ante,* at 687 (quoting *Colville, supra,* at 161). But this reliance is misplaced because the language is found

Rather, the holding in *Oliphant, supra,* was based on an analysis of Congress' actions *with respect to non-Indians.* The Court first considered the "commonly shared presumption of Congress, the Executive Branch, and lower federal courts that tribal courts do not have the power to try non-Indians." *Id.,* at 206. Then the Court declared that the power to punish non-Indians was inconsistent with the tribes' dependent status, for such power conflicted with the overriding interest of the Federal Government in protecting its citizens against "unwarranted intrusions" on their liberty. See *id.,* at 208–212. "By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily [gave] up their power to try *non-Indian* citizens of the

in the Court's discussion of the *State's* power over nonmember Indians rather than a discussion of the tribe's power. We have not allowed States to regulate activity on a reservation that interferes with principles of tribal self-government. See *Colville,* 447 U. S., at 161. Thus in *Colville,* we held that the State could tax nonmembers who purchased cigarettes on a reservation; such taxation would not interfere with tribal self-government because nonmembers are not constituents of the tribe. See *ibid.* Yet at the same time, we held that the tribe could *also* tax the nonmember purchasers because the power to tax was not implicitly divested as inconsistent with the overriding interests of the Federal Government. See *id.,* at 153.

Similarly, the Court's citation to *Montana* v. *United States,* 450 U. S. 544 (1981), for the "'general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe,'" *ante,* at 687 (quoting *Montana, supra,* at 565), is also inapposite. In *Montana,* the Court concluded that the Tribe could regulate hunting and fishing by nonmembers on lands held by the Tribe, but not on lands within the reservation no longer held by the Tribe. See 450 U. S., at 564. The Court recognized, however, that tribes have, as a matter of inherent sovereignty, power over nonmembers when they engage in consensual relationships with tribal members and when their conduct "threatens or has some direct effect on the political integrity, the economic stability, or the health or welfare of the tribe." *Id.,* at 566 (citations omitted). The Court today provides no explanation for why the exercise of criminal jurisdiction over a nonmember who commits a crime on property held by the tribe involves different concerns, see *ante,* at 688, such that tribes were implicitly divested of that power.

United States except in a manner acceptable to Congress." *Id.*, at 210 (emphasis added).

A consideration of the relevant congressional enactments reveals that the opposite conclusion is appropriate with respect to nonmember Indians. In 1790, when Congress first addressed the rules governing crimes in Indian country, it made crimes committed by citizens or inhabitants of the United States against Indians punishable according to the laws of the State in which the offense occurred and directed the state courts to take jurisdiction of such offenses. See The Trade and Intercourse Act of 1790, 1 Stat. 138, ch. 33. In 1817, Congress withdrew that jurisdiction from the States and provided for federal jurisdiction (and the application of federal enclaves law) over crimes committed within Indian country. Congress made an explicit exception for crimes committed by an Indian against another Indian, however: "[N]othing in this act shall be so construed . . . to extend to any offence committed by one Indian against another, within any Indian boundary." 3 Stat. 383, ch. 92, codified, as amended, at 18 U. S. C. § 1152. In 1854, Congress again amended the statute to proscribe prosecution in federal court of an Indian who had already been tried in tribal court. 10 Stat. 270, ch. 30. Finally, in 1885, Congress made a limited but significant departure from its consistent practice of leaving to Indian tribes the task of punishing crimes committed by Indians against Indians. In response to this Court's decision in *Ex parte Crow Dog*, 109 U. S. 556, 571 (1883), which held that there was no federal jurisdiction over an Indian who murdered another member of his tribe, Congress passed the Indian Major Crimes Act, 23 Stat. 385, ch. 341, codified, as amended, at 18 U. S. C. § 1153, under which certain enumerated crimes, including murder, manslaughter, and arson, fall within federal jurisdiction when involving two Indians.

In *Oliphant*, the Court relied on this statutory background to conclude that the exercise of tribal jurisdiction over non-

Indians was inconsistent with the tribes' dependent status, for from the early days Congress had provided for federal jurisdiction over crimes involving non-Indians. Thus, from these affirmative enactments, it could be inferred that the tribes were tacitly divested of jurisdiction over non-Indians. See *Oliphant*, 435 U. S., at 199–206. But applying the same reasoning, the opposite result obtains with respect to tribal jurisdiction over nonmember Indians. From the very start, Congress has consistently exempted Indian-against-Indian crimes from the reach of federal or state power; although the exemption in the 1790 statute was implicit, it was made explicit in the 1817 Act. Moreover, the provision in the 1854 Act exempting from federal jurisdiction any Indian who had been previously punished by a tribal court amounts to an express acknowledgment by Congress of tribal jurisdiction over Indians who commit crimes in Indian country. The appropriate inference to be drawn from this series of statutes excluding Indian-against-Indian crimes from federal jurisdiction is that tribes retained power over those crimes involving only Indians. See *Wheeler*, 435 U. S., at 324–326.

The Court acknowledges that these enactments support the inference that tribes retained power over *members* but concludes that no such inference can be drawn about tribal power over *nonmembers*. The Court finds irrelevant the fact that we have long held that the term "Indian" in these statutes does not differentiate between members and nonmembers of a tribe. See *United States* v. *Kagama*, 118 U. S. 375, 383 (1886); see also *United States* v. *Rogers*, 4 How. 567, 573 (1846) (the exception "does not speak of members of a tribe, but of the race generally, — of the family of Indians"). Rather, the Court concludes that the federal definition of "Indian" is relevant only to *federal* jurisdiction and is "not dispositive of a question of *tribal* power." *Ante*, at 690. But this conclusion is at odds with the analysis in *Oliphant* in which the congressional enactments served as evidence of a "commonly shared presumption" that tribes had

ceded their power over non-Indians. Similarly, these enact-
ments reflect the congressional presumption that tribes had
power over all disputes between Indians regardless of tribal
membership.[2]

By refusing to draw this inference from repeated congres-
sional actions, the Court today creates a jurisdictional void in
which neither federal nor tribal jurisdiction exists over non-
member Indians who commit minor crimes against another

---

[2] The Court concedes that the statutes reflect a "tendency of past Indian
policy to treat Indians as an undifferentiated class." *Ante*, at 690. Nev-
ertheless the Court rejects the logical implications of such a policy, reason-
ing that "[t]he historical record prior to the creation of modern tribal courts
shows little federal attention to the individual tribes' power as between
themselves or over one another's members." *Ibid.*

To the contrary, the historical record reveals that Congress and the Ex-
ecutive had indeed considered the question of intertribal crime. In 1834,
Congress proposed the Western Territories bill that would have relocated
all Indians to the western part of the United States. One provision would
have created a General Council to regulate commerce among the various
tribes, preserve peace, and punish intertribal crimes. See H. R. Rep.
No. 474, 23d Cong., 1st Sess., 36 (1834). Although the bill never passed,
it clearly shows that Congress assumed that the Indians would police inter-
tribal disputes. See *Oliphant*, 435 U. S., at 202 (relying on different pro-
vision of bill). In addition, it is clear that the Executive Branch consid-
ered the question of intertribal disputes. In 1883, the Solicitor of the
Department of the Interior issued an opinion, adopted by the Attorney
General, dealing with the question of federal jurisdiction over an Indian ac-
cused of murdering a member of another Tribe. Presaging this Court's
holding in *Ex parte Crow Dog*, 109 U. S. 556 (1883), by a few months, the
Attorney General concluded that there was no federal jurisdiction over the
crime because it fell within the Indian-against-Indian exception. 17 Op.
Atty. Gen. 566 (1883). The opinion concluded: "If no demand for Foster's
surrender shall be made by one or other of the tribes concerned, founded
fairly upon a violation of some law of one or other of them having jurisdic-
tion of the offense in question . . . it seems that nothing remains except to
discharge him." *Id.*, at 570. Given the proximity of this incident to the
Crow Dog incident, it is implausible to conclude that Congress did not con-
sider the situation of intertribal crimes when passing the Indian Major
Crimes Act.

Indian.[3]  The Court's conclusion that such a void does not counsel in favor of finding tribal jurisdiction, see *ante*, at 696, misses the point.  The existence of a jurisdictional gap is not an independent justification for finding tribal jurisdiction, but rather is relevant to determining congressional intent.  The unlikelihood that Congress intended to create a jurisdictional void in which *no* sovereign has the power to prosecute an entire class of crimes should inform our understanding of the assumptions about tribal power upon which Congress legislated.  See *Oliphant, supra,* at 206 ("'Indian law' draws principally upon the treaties drawn and executed by the Executive Branch and legislation passed by Congress.  These instruments, which beyond their actual text form the backdrop for the intricate web of judicially made Indian law, cannot be interpreted in isolation but must be read in light of the common notions of the day and the as-

---

[3] Because of the Indian-against-Indian exception in 18 U. S. C. § 1152, federal courts have no jurisdiction over such crimes.  In addition, it has long been accepted that States do not have power to exercise criminal jurisdiction over crimes involving Indians on the reservation.  See *Worcester* v. *Georgia,* 6 Pet. 515, 561 (1832).  In 1953, however, Congress enacted Pub. L. 280, codified, as amended, at 18 U. S. C. § 1162, which allows named States to assume jurisdiction over all crimes within Indian country.  In § 401(a) of the Indian Civil Rights Act of 1968 (ICRA), 82 Stat. 79, codified at 25 U. S. C. § 1321(a), Congress modified Pub. L. 280 to require the affected tribe to consent to a State's assumption of jurisdiction.  Arizona has not accepted jurisdiction over crimes occurring on Indian reservations.  Thus, under the Court's holding today, the tribe, the Federal Government, and the State each lack jurisdiction to prosecute the crime involved in this case.

The Court erroneously equates the jurisdictional void that resulted from the holding in *Oliphant* with the void created by the opinion today.  Since federal courts have jurisdiction over crimes involving non-Indians, any "void" resulting from the holding in *Oliphant* would have been caused by the discretionary decision of the Federal Government not to exercise its already-established jurisdiction.  Such a "practical" void, *ante,* at 696, is a far cry from the "legal" void, *ibid.,* created today, in which no sovereign has the power to prosecute an entire class of crimes.

sumptions of those who drafted them") (citations omitted); *Rogers*, 4 How., at 573 ("It can hardly be supposed that Congress intended to" treat whites "adopted" by Indians as fitting within the Indian-against-Indian exception). Since the scheme created by Congress did not differentiate between member and nonmember Indians, it is logical to conclude that Congress did not assume that the power retained by tribes was limited to member Indians.

## B

The Court also concludes that because Indians are now citizens of the United States, the exercise of criminal jurisdiction over a nonmember of the tribe is inconsistent with the tribe's dependent status. Stated differently, the Court concludes that regardless of whether tribes were assumed to retain power over nonmembers as a historical matter, the tribes were implicitly divested of this power in 1924 when Indians became full citizens. See *ante*, at 692 ("Whatever might be said of the historical record, we must view it in light of petitioner's status as a citizen of the United States"). The Court reasons that since we held in *Oliphant* that the exercise of criminal jurisdiction over non-Indians conflicted with the Federal Government's "'great solicitude that its citizens be protected . . . from unwarranted intrusions on their personal liberty,'" *ante* at 692 (quoting *Oliphant*, 435 U. S., at 210), the exercise of criminal jurisdiction over nonmember Indians is also inconsistent with this overriding national interest.

There are several problems with this argument. First, in *Oliphant* the Court held merely that "[b]y submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States *except in a manner acceptable to Congress*." *Oliphant, supra,* at 210 (emphasis added). The touchstone in determining the extent to which citizens can be

subject to the jurisdiction of Indian tribes, therefore, is whether such jurisdiction is acceptable to Congress. Cf. *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, 154 (1980) ("[I]t must be remembered that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States"). In *Oliphant*, federal statutes made clear that the prosecution of non-Indians in tribal courts is *not* acceptable to Congress. By contrast, the same statutes reflect the view that the prosecution of all Indians in tribal courts *is* acceptable to Congress.

Moreover, this argument proves too much. If tribes were implicitly divested of their power to enforce criminal laws over nonmember Indians once those Indians became citizens, the tribes were also implicitly divested of their power to enforce criminal laws over their own *members* who are now citizens as well. The Court contends, however, that tribal members are subject to tribal jurisdiction because of "the voluntary character of tribal membership and the concomitant right of participation in a tribal government." *Ante*, at 694. But we have not required consent to tribal jurisdiction or participation in tribal government as a prerequisite to the exercise of civil jurisdiction by a tribe, see *Williams* v. *Lee*, 358 U. S. 217, 223 (1959), and the Court does not explain why such a prerequisite is uniquely salient in the criminal context. Nor have we ever held that participation in the political process is a prerequisite to the exercise of criminal jurisdiction by a sovereign. If such were the case, a State could not prosecute nonresidents, and this country could not prosecute aliens who violate our laws. See, *e. g.*, *United States* v. *Verdugo-Urquidez*, 494 U. S. 259 (1990); *id.*, at 279–281 (BRENNAN, J., dissenting). The commission of a crime on the reservation is all the "consent" that is necessary to allow the tribe to exercise criminal jurisdiction over the nonmember Indian.

Finally, the Court's "consent" theory is inconsistent with the underlying premise of Indian law, namely, that Congress

has plenary control over Indian affairs. Congress presumably could pass a statute affirmatively granting Indian tribes the right to prosecute anyone who committed a crime on the reservation—Indian or non-Indian—unconstrained by the fact that neither of these groups participate in tribal government.[4] It is therefore unclear why the exercise of power retained by the tribes—power not divested by Congress—is subject to such a constraint.

More understandable is the Court's concern that nonmembers may suffer discrimination in tribal courts because such courts are "influenced by the unique customs, languages, and usages of the tribes they serve." *Ante*, at 693. But Congress addressed this problem when it passed the ICRA, 25 U. S. C. § 1301 *et seq.*, which extended most of the Bill of Rights to any person tried by a tribal court.[5] See *Santa*

---

[4] The Court's suggestion that there might be some independent constitutional limitation on the ability of Congress to subject its citizens to prosecution by tribal courts that do not provide a criminal defendant constitutional rights, see *ante*, at 693–694, is unpersuasive given that Congress has, through the ICRA, 25 U. S. C. § 1301 *et seq.*, extended to those tried by a tribal court most of the protections of the Bill of Rights, see n. 5, *infra*, most importantly, the right to due process. 25 U. S. C. § 1302(8). Moreover, the Court's argument proves too much, for it does not account for why members who are also citizens would be subject to tribal jurisdiction; participation in tribal government cannot in and of itself constitute a knowing and intelligent waiver of constitutional rights.

[5] The ICRA provides, in relevant part, that a tribe shall not:

"(2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizure . . . ;

"(3) subject any person for the same offense to be twice put in jeopardy;

"(4) compel any person in any criminal case to be a witness against himself;

.      .      .      .      .

"(6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process

*Clara Pueblo* v. *Martinez*, 436 U. S. 49, 63 (1978). In addition, the ICRA provides the remedy of habeas corpus to challenge the legality of any detention order by a tribe. 25 U. S. C. § 1303. The equal protection provision, § 1302(8), requires that nonmembers not be subject to discriminatory treatment in the tribal courts.[6] In addition, the due process clause, *ibid.*, ensures that each individual is tried in a fundamentally fair proceeding.

## II

This country has pursued contradictory policies with respect to the Indians. Since the passage of the Indian Reorganization Act of 1934, 48 Stat. 984, ch. 576, § 1, codified at 25 U. S. C. § 461, however, Congress has followed a policy of promoting the independence and self-government of the vari-

---

for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;

"(7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments . . . ;

"(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;

"(9) pass any bill of attainder or ex post facto law; or

"(10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons." 25 U. S. C. § 1302.

[6] Petitioner argues that the exercise of jurisdiction over a nonmember violates the equal protection provision of the ICRA, 25 U. S. C. § 1302(8), because the Tribe does not exercise jurisdiction over non-Indians. This argument is without merit. The statutory equal protection provision requires the Tribe to refrain from denying "to any person *within its jurisdiction* the equal protection of its laws." *Ibid.* (emphasis added). Thus, petitioner's argument simply begs the question of who is within the Tribe's jurisdiction. If nonmember Indians are subject to the criminal jurisdiction of the Tribe, the exercise of jurisdiction in this case does not violate the equal protection provision of the ICRA. Petitioner would state a valid equal protection claim, however, if he could show that in the exercise of its jurisdiction, the Tribe treated him differently than others who are also subject to its jurisdiction.

ous tribes. The Court's decision today not only ignores the assumptions on which Congress originally legislated with respect to the jurisdiction over Indian crimes, but also stands in direct conflict with current congressional policy. I respectfully dissent.