No. **SC-CV-61-98**
# Supreme Court of the Navajo Nation

**Russell Means, Petitioner,**

v.

**The District Court of
the Chinle Judicial District, Respondent.[1]
Decided May 11, 1999**

## OPINION

Before YAZZIE, Chief Justice, AUSTIN, Associate Justice, and TOLEDO, Associate Justice (sitting by designation).

John Trebon, Esq., Flagstaff, Arizona, for the Petitioner; and Donovan D. Brown, Esq., Navajo Nation Chief Prosecutor, Window Rock, Navajo Nation (AZ), and Victor Clyde, Esq., Chinle District Prosecutor, Chinle, Navajo Nation (AZ), for the Respondent.

Opinion delivered by YAZZIE, Chief Justice.

This is an original action for a writ of prohibition under 7 N.N.C. § 303 (1995) to prevent or remedy an act of the Chinle District Court which is allegedly beyond that court's jurisdiction, namely denying Russell Means' ("petitioner") motion to dismiss criminal charges against him. Judge Ray Gilmore denied the petitioner's motion in an opinion and order on July 20, 1998. The petitioner then sought a writ of prohibition from this Court.

The petition alleges that the Navajo Nation lacks criminal jurisdiction over the petitioner, who is a member of the Oglala Sioux Nation.[2] Alternatively, the petitioner requests this Court to prohibit the Chinle District Court from exercising criminal jurisdiction, because a prosecution would violate the equal protection provisions of the 1968 Indian Civil Rights Act, the Navajo Nation Bill of Rights at 1 N.N.C. § 3 (equal protection), and the fifth amendment of the United States Constitution. The petitioner (at pages 3-4 of his brief) also broadly asserts that the Navajo Nation has no criminal jurisdiction over non-Navajo Indians under the Treaty of June 1, 1868 between the United States of America and the Navajo

---

1. The petitioner's attorney incorrectly denominated this case as "The Navajo Nation v. Means." This is an original action for a writ of prohibition, so the case name should reflect the real parties in interest.

2. The petitioner uses the political term "Nation" in his moving papers, although "Oglala" is misspelled.

Nation; that the petitioner has not consented to criminal jurisdiction by virtue of his marriage to a Navajo and residence within the Navajo Nation; and that 25 U.S.C. § 1301(2), as amended to recognize Indian nation criminal jurisdiction over nonmember Indians ("Duro fix" legislation), is not permissible "preference legislation," but instead legislation which violates equal protection of the law. The nub of the equal protection challenge is that while the Navajo Nation "cannot" prosecute non-Indians, the Nation is trying to prosecute the petitioner as a nonmember Indian.

Given the allegations of the petition and the petitioner's formulation of the issues, we will decide the following questions:[3]

1.  Does the June 1, 1868 Treaty between the United States of America and the Navajo Nation recognize Navajo Nation criminal jurisdiction over individuals who are not members of the Navajo Nation or Tribe of Indians?

2.  Has the petitioner consented to the criminal jurisdiction of the Navajo Nation by virtue of his assumption of tribal relations with Navajos?

3.  Does the assertion of criminal jurisdiction over the petitioner violate equal protection of the law, and is the assertion of such jurisdiction a "political" or a "racial" classification?

I

On December 28, 1997, the Navajo Nation charged the petitioner with three offenses: threatening Leon Grant in violation of 17 N.N.C. § 310 (1995); committing a battery upon Mr. Grant in violation of 17 N.N.C. § 316; and committing a battery upon Jeremiah Bitsui, also in violation of 17 N.N.C. § 316. Threatening has a maximum potential penalty of imprisonment for a term up to 90 days, a $250 fine, or both, and battery has a maximum potential penalty of incarceration up to 180 days, a $500 fine, or both. The Navajo Nation Criminal Code of 1977 provides, at 17 N.N.C. § 225, that a defendant found guilty of an offense may receive a multiple sentence, with the sentence to run concurrently or consecutively. The petitioner faces a maximum exposure of 450 days incarceration, a fine of $1,250, or both, along with the payment of restitution to the victims of the alleged offenses. 17 N.N.C. § 220(C).

The petitioner filed a motion to dismiss the three charges on January 23, 1998, and the district court held an evidentiary hearing on the motion on April 14, 1998. The petitioner voluntarily testified at the hearing to relate his connections with Navajos and the Navajo Nation. The court denied the motion on July 20, 1998.

---

3. The petitioner invites us to declare that an Act of Congress is unconstitutional under the fifth amendment to the United States Constitution (equal protection doctrine). While this Court has the authority to use all "applicable" laws of the United States under 7 N.N.C. § 204(A) (1995), and the United States Constitution is an "applicable" law, we defer to the federal judiciary on the issue of the constitutionality of 25 U.S.C. § 1301(2), as amended. We need not reach the issue of the constitutionality of a federal statute to make our decision.

Before summarizing the testimony elicited during the April 14, 1998 hearing, this Court will use judicial notice[4] to describe the demography of the Navajo Nation and its criminal justice problems.[5]

## A

The Navajo Nation is the largest Indian nation in the United States in terms of geographic size. It has 17,213,941.90 acres of land (approximately 25,000 square miles) as of 1988, including Navajo tribal trust land, land owned in fee, individual Navajo allotments, and various leases. Etsitty, *NN Fax 1993: A statistical abstract of the Navajo Nation* 49 (1994).[6] The Navajo Nation membership is the second largest of all Indian nations within the United States, with a total estimated membership of 225,298 persons as of 1990. United States Bureau of the Census, *Top 25 American Indian Tribes for the United States: 1990 and 1980* Table 1 (August 1995). The 1990 population of the Navajo Nation was 145,853 persons of "all races," with 140,749 American Indians, Eskimos and Aleuts, and 5,104 individuals of "other races." Rodgers, *1990 Census Population and Housing Characteristics of the Navajo Nation*, Table NN04 (1993). Of that population, 96.62% was Indian and 3.38% was "non-American Indian." *Id.* at 35. Of the American Indian population, 131,422 individuals were Navajos and 9,327 were "other Indians." *Id.* at Table NN04. Therefore, the percentage of nonmember Indians in the Navajo Nation population was 6.39%. There were 126 Sioux Indians residing within the Navajo Nation as of 1990. *Id.*

The Navajo Nation courts had 27,602 criminal cases during Navajo Nation Fiscal Year 1998 (October 1, 1997 through September 30, 1998). The five major categories of offenses were 6,128 driving while intoxicated charges (22.20% of all criminal cases), 6,090 crimes against persons (22.06%), 2,284 offenses against the family (8.27%), 2,208 intoxicating liquor offenses (possession or sale) (7.99%), and 2,167 offenses against the public order (7.85%). The largest single category of civil cases was petitions for domestic abuse protection orders, and there were 3,435 such cases during the fiscal year.

While these figures may have more to do with police and prosecution priorities than with the actual Navajo Nation crime picture, they show that the Navajo Nation courts are dealing with very serious criminal offenses. The pattern shown

---

4. Given that there is an equal protection challenge here, the usual practice is to look for "legislative facts" to support different treatment of individuals in separate classifications, i.e. nonmember Indians. The pertinent legislative facts are those which support the Navajo Nation's governmental interests in asserting jurisdiction over "All violations of laws of the Navajo Nation committed within its territorial jurisdiction," 7 N.N.C. § 253(A), and jurisdiction over "any person" who commits an offense under 17 N.N.C. § 203. We follow *Muller v. Oregon*, 208 U.S. 412, 420-421 (1908), to take judicial notice of legislative facts.

5. We note the United States Supreme Court's interest in such figures, e.g. *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 182 n.1 (1978), and *Duro v. Reina*, 495 U.S. 676, 695 (1990).

6. While the Navajo Nation is usually compared in size to the State of West Virginia, it is in fact almost as large as the State of South Carolina, the 40th state in size. Yazzie, *Hozho Nahasdlii - We are now in Good Relations: Navajo Restorative Justice*, 9 St. Thomas L. Rev. 117, 118 (1996).

above has been fairly consistent over the past several years, and the top five categories of criminal offenses switched places a few times. In sum, the Navajo Nation courts are addressing the serious criminal and social problems of drunk driving, assaults and batteries (including aggravated assault and battery with deadly weapons), sex offenses against children, disorderly conduct, and public intoxication.[7] Many of the crimes against persons are acts of in-family violence, and the civil domestic abuse restraining order numbers show that family violence may be the most serious social problem in the Navajo Nation.[8]

Given the United States Indian education policy of sending Indian children to boarding schools, Indians in the armed services, modern population mobility, and other factors, there are high rates of intertribal intermarriage among American Indians. As noted, at least 9,327 "other" or nonmember Indians resided within the Navajo Nation in 1990. They are involved in some of the 27,000 plus criminal charges in our system and in the 3,435 plus domestic violence cases. The questions are whether nonmember Indians should have de facto immunity from criminal prosecution, given the failure of federal officials to effectively address crime in the Navajo Nation, and whether this Court should rule that thousands of innocent victims, Navajo and non-Navajo, should be permitted to suffer. We must sadly take judicial notice of the fact that, with a few exceptions, non-Indians and nonmember Indians who commit crimes within the Navajo Nation escape punishment for the crimes they commit. The social health of the Navajo Nation is at risk in addressing the petitioner's personal issues, as is the actual health and well-being of thousands of people.

Recent United States Justice Department statistics confirm the severity of the situation. As of 1996, Navajos constituted 11.7% of American Indians. Greenfeld and Smith, *American Indians and Crime* 1 (Bureau of Justice Statistics, U.S. Department of Justice, February 1999). The Bureau of Justice Statistics made these summary findings about crime and American Indians:

> * American Indians experience per capita rates of violence which are more than twice those of the U.S. resident population.
> * Rates of violence in every age group are higher among American Indians than that of all races.
> * Nearly a third of all American Indian victims of violence are between ages 18 and 24. This group of American Indians experienced the highest per capita rate of violence of any racial group considered by age - about 1 violent crime for every 4 persons of this age.

---

7. This is a serious matter, because of people freezing to death in ditches or wandering into traffic.

8. A survey of Navajos in the northwestern New Mexico and northern Arizona portions of the Navajo Nation done between 1993 and 1995 showed that 28.6% of Navajo women age 50 and older and 52.7% of Navajo women under age 50 reported being struck at least once. That compares with 9 to 30% of women in other populations. Kunitz, Levy, McCloskey & Bagriel, *Alcohol Dependence and Domestic Violence as Sequelae of Abuse and Conduct Disorder in Childhood*, 22(22) Child Abuse & Neglect 1079, 1088 (1998).

* Rates of violent victimization for both males and females are higher among American Indians than for all races. The rate of violent crime experienced by American Indian women is nearly 50% higher than that reported by black males.
* At least 70% of the violent victimizations experienced by American Indians are committed by persons not of the same race - a substantially higher rate of interracial violence than experienced by white or black victims.[9]
* American Indian victims of violence were the most likely of all races of victims to indicate that the offender committed the offense while drinking.
* The 1997 arrest rate among American Indians for alcohol-related offenses (driving under the influence, liquor law violations, and public drunkenness) was more than double that found among all races. Drug arrest rates for American Indians were lower than average.

*Id.* at v-vii (selected highlights).

These are unpleasant facts. However, they point to the need to exercise criminal jurisdiction over all who enter the Navajo Nation. Indian nation courts are at the front line of attempts to control crime and social disruption. They share a common responsibility with police, prosecutors, defenders, and social service programs to address crime and violence for the welfare of not only the Navajo People, but all those who live within the Navajo Nation or reside in areas adjacent to the Navajo Nation.[10] Indian nations cannot rely upon others to address the problems identified by the Bureau of Justice Statistics. The Navajo Nation courts have primary jurisdiction to deal with criminal offenses and they must be free to exercise that jurisdiction.

B

The petitioner is a member of the Oglala Sioux Nation. Transcript of proceedings, April 14, 1998, at 5 (hereafter "TR") (Petitioner's testimony). He was 58 years of age as of the date of the hearing, TR *id.*, and he resided for ten years within the Navajo Nation from 1987 through 1997. TR *id.* He was married to Gloria Grant, an enrolled Navajo woman. TR at 6-7. Leon Grant, whom the petitioner is charged with threatening and battering, is a member of the Omaha Tribe, and Jeremiah Bitsui, whom the petitioner is charged with battering, is Navajo. TR at 40. The memorandum in support of the petition for a writ of prohibition indicates, at page 2, that Mr. Grant was the petitioner's father-in-law at the time of the incident. The petitioner moved from the Navajo Nation to Porcupine, South Dakota within the Pine Ridge Reservation, in December of 1997. TR at 6, 23.

The petitioner complained of a lack of hospitality toward him when he resided within the Navajo Nation. He said he could not vote, run for Navajo Nation

---

9. One of the problems with this study is that it mixes off-reservation data with very limited on-reservation crime data. This conclusion may reflect off-reservation criminal activity.

10. State officials frequently complain of the spillover effects of Navajo Nation crime and urge the Nation to take more effective crime prevention actions. There are cooperative efforts to enhance that effort.

office (including judicial office), become a Navajo Nation Council delegate, the president, vice-president, or be a member of a farm board. In sum, he could not attain any Navajo Nation political position. TR at 8. He said he could not sit on a jury and received no notice to appear for jury duty. TR at 8-9. That may be because the petitioner was not on any Navajo Nation registration or voter list and he was not on the voter registration list for Apache County, Arizona. TR at 9. He complained at length about his inability to get a job or start a business because of Navajo Nation employment and contracting preference laws.

The petitioner's national reputation as an activist is well-known. On cross-examination, the prosecution attempted to develop the petitioner's active participation in the public and political life of the Navajo Nation. The prosecution highlighted the petitioner's attendance at chapter meetings and elicited the fact that subsequent to a 1989 incident when Navajos were shot by Navajos, he led a march to the court house for a demonstration to make a "broad statement" about political activities of the Navajo Nation. TR at 31

The "facts" the petitioner related during his testimony are only partially correct. While it is true that there are preference laws for employment and contracting in the Navajo Nation, they are not an absolute barrier to either employment or the ability to do business. There are many non-Navajo employees of the Navajo Nation (some of whom hold high positions in Navajo Nation government), and non-Navajo businesses operate within the Navajo Nation. The ability to work or do business within the Navajo Nation has a great deal more to do with individual initiative and talent than preference laws. The petitioner was most likely not called for jury duty because he did not register to vote in Arizona. Non-Navajos have been called for jury duty since at least 1979. *George v. Navajo Tribe*, 2 Nav. R. 1 (1979); *Navajo Nation v. MacDonald*, 6 Nav. R. 432 (1991). The 126 Sioux Indians listed in the 1990 Census can be called for jury duty if they are on a voter list and are called. If the petitioner was an indigent at the time of his arraignment, he would have been eligible for the appointment of an attorney.[11]

## II

The first issue is whether the June 1, 1868 Treaty between the United States of America and the Navajo Nation gives the Navajo Nation courts criminal jurisdiction over individuals who are not members of the Navajo Nation or Tribe of Indians. We will first discuss the 1868 Treaty as a source of criminal jurisdiction and then apply it.

---

11. The petitioner's attorney was asked whether Navajo Nation law affords criminal defendants all the rights guaranteed by the sixth amendment to the United States Constitution during oral argument, and he evaded the question. Although such is not required by the Indian Civil Rights Act of 1968, criminal defendants in the Navajo Nation court system are entitled to the appointment of counsel if they are indigent, and they are entitled to a jury composed of a fair cross-section of Navajo Nation population, including non-Indians and nonmember Indians. The petitioner has all the rights he would have in a state or federal court. See Navajo Rules of Criminal Procedure (1990).

A

There is a general and false assumption that Indian nations have no criminal jurisdiction over non-Indians and nonmember Indians. While the United States Supreme Court ruled that Indian nations have no *inherent* criminal jurisdiction over non-Indians in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), and that there is no inherent criminal jurisdiction over nonmember Indians in *Duro v. Reina*, 495 U.S. 676 (1990), criminal jurisdiction over nonmembers can rest upon a treaty or federal statute. The Supreme Court reserved the issues of affirmative congressional authorization or treaty provisions in both cases. *Oliphant*, 435 U.S. at 195-197; *Duro*, 495 U.S. at 684. Therefore, we will examine whether the Navajo Nation Treaty of 1868 is a source of Navajo Nation criminal jurisdiction over nonmember Indians.

The basic canons of treaty construction are:

1. A treaty must be construed as the Indians understood it.[12] *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970); *United States v. Shoshone Tribe*, 304 U.S. 111, 116 (1938); *United States v. Winans*, 198 U.S. 371, 380-81 (1905).

2. Doubtful or ambiguous expressions in a treaty must be resolved in favor of the given Indian nation. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999); *Oliphant*, 435 U.S. at 208 n. 17; *Carpenter v. Shaw*, 280 U.S. 363, 367 (1930); *Winters v. United States*, 207 U.S. 564, 576-77 (1908).

3. Treaty provisions which are not clear on their face may be interpreted from the surrounding circumstances and history. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196; *Oliphant*, 435 U.S. at 208 n. 17; *DeCoteau v. District County Court*, 420 U.S. 425, 555 (1975).

4. A treaty is not a grant of rights to Indian nations but a grant of rights from them, with reservations of all rights which are not granted. *Washington v. Washington State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 680 (1979); *United States v. Winans*, 198 U.S. at 381.

5. Treaties with Indian nations are the law of the land under the treaty clause of the Constitution. *Worcester v. Georgia*, 31 U.S. (6 Pet. ) 515, 558 (1832).

B

The Treaty between the Navajo Nation or Tribe of Indians and the United States was negotiated at Fort Sumner, New Mexico Territory, on May 28, 29, and 30, 1868, and it was executed there on June 1, 1868. The United States Senate advised ratification of the Treaty on July 25, 1868, and President Andrew Johnson proclaimed it on August 12, 1868, 15 Stats. 667. We are primarily interested in language found in Article II of the Treaty, which we will call the "set

---

12. We understand this canon to mean that we have the authority to interpret the treaty as Navajos understand it today. That includes the knowledge passed on to us by our ancestors through oral traditions.

apart for the use and occupation" clause, and that in Article I, which we will call the "bad men" clause.

Article II of the Treaty, 15 Stats. at 668, begins with a boundary description and then says that "this reservation" is "set apart for the use and occupation of the Navajo tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them...." Federal courts use this language as the basis for Navajo Nation civil jurisdiction. *Williams v. Lee*, 358 U.S. 217, 221-223 (1959); *Littell v. Nakai*, 344 F.2d 486, 488 (9th Cir. 1965); *UNC Resources, Inc. v. Benally*, 518 F. Supp. 1046, 1050 (D. Ariz. 1981). The Supreme Court held that the Navajo Nation retained its inherent criminal jurisdiction over members in *United States v. Wheeler*, 435 U.S. 313, 323 (1978).

The plain language of Article II indicates that the Navajo Reservation exists for the exclusive use of not only Navajos, but other Indians, either as tribes or as individuals, where both the Navajo Nation and the United States agree to their admission. Given that the jurisdiction of our courts is recognized in the Article II language, Indians such as the petitioner who are permitted to reside within the Navajo Nation fall within the same grouping as Navajo Indians in terms of the Treaty's coverage.

We see this provision applied in the historical record. On September 27, 1881, Agent Galen Eastman wrote to the Commissioner of Indian Affairs to inform him that about forty Pah-Utes (Paiutes) had arrived in a starving condition and were begging for food. They said "they were going to cease their predatory life and use the hoe thereafter." The Navajo reply was that "if the Great Father is willing, we will try you again and be responsible for your good behavior for we used to be friends and have intermarried with your people and yours with ours ... but if you return to your bad life, thieving and murdering we (the Navajos) will hang you." Obviously, thinking of the language in Article II of the Treaty, Eastman asked for instructions.[13]

The "bad men" among either "the Indians" or "whites" language has been litigated in various contexts, but the closest interpretation on the issue of criminal jurisdiction was in the case of *State ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir. 1969). There, the State of Arizona arrested a Cheyenne Indian within the Navajo Nation using the "bad men among the Indians" Treaty language as its justification, and the court ruled that the arrest of an Indian had to follow the extradition provision in the "bad men" clause. 413 F.2d at 686. The "bad men" clause has been used as the basis for concurrent civil jurisdiction in the Navajo Nation courts. *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 595 (9th Cir. 1983).

Using surrounding circumstances, history, and the "as the Indians understood it" canon of treaty construction, the issue of how to deal with "bad" Indians was

---

13. While the Paiutes lived among Navajos and became part of them, those in the Western Agency sought and obtained recognition as an Indian nation, and a treaty with the Navajo Nation to establish a Paiute reservation is presently under negotiation.

the subject of specific discussions at Fort Sumner. Barboncito, the primary Navajo treaty negotiator, gave an opening speech where he outlined the hardships suffered by Navajos at the adjoining Bosque Redondo "reservation."[14] He complained: "I think that all nations around here are against us (I mean Mexicans and Indians) the reason is that we are a working tribe of Indians, and if we had the means we could support ourselves far better than either Mexican or Indian. The Comanches are against us I know it for they came here and killed a good many of our men. In our own country we knew nothing about the Comanche." Link, *Treaty Between the United States of America and the Navajo Tribe of Indians* 3-4 (1968) (hereafter "Link"). General William T. Sherman said this in reply: "The Army will do the fighting, you must live at peace, if you go to your own country the Utes will be the nearest Indians to you, you must not trouble the Utes and the Utes must not trouble you. If, however, the Utes or Apaches come into your country with bows and arrows and guns you of course can drive them out but must not follow beyond the boundary line." Link at 5.

There are two foundations for criminal jurisdiction in the Treaty of 1868, the history of its negotiation, and its application: those who assume relations with Navajos with the consent of the Navajo Nation and the United States are permitted to enter and reside within the Navajo Nation, subject to its laws, and non-Navajo Indians who enter and commit offenses are subject to punishment. That is what General Sherman told the Navajos who were assembled behind the fort hospital on June 28, 1868.[15] It is quite obvious from Galen Eastman's September 17, 1881 letter to the Commissioner of Indian Affairs that the Navajo leadership was thinking of admitting Paiutes to the Navajo Nation, and if they were admitted, they would be subject to punishment for theft and murder by Navajos.

Therefore, we conclude that the Chinle District Court has criminal jurisdiction over the petitioner by virtue of the 1868 Treaty. The petitioner entered the Navajo Nation, married a Navajo woman, conducted business activities, engaged in political activities by expressing his right to free speech, and otherwise satisfied the Article II conditions for entry and residence and Articles I and II court jurisdiction.

## III

It is clear that the Navajo Nation has jurisdiction over its own "members." *Wheeler*, 435 U.S. at 323. The United States Supreme Court addressed the issue of membership and consent in the *Duro* decision and went on to say: "We held in *United States v. Rogers*, 4 How. 567 (1846), that a non-Indian could not, through his adoption into the Cherokee Tribe, bring himself within the federal definition of

---

14. There is some debate over whether Bosque Redondo on the Pecos River in eastern New Mexico was an Indian "reservation." Some historians assert that it was, but the United States Court of Claims has said that it is "dubious" that it was. *Navajo Tribe of Indians v. United States*, 597 F.2d 1367, 1369 (Ct. Cl. 1979).

15. During that first day of negotiations, General Sherman and Colonel Samuel F. Tappan "negotiated" with all of the approximately 9,500 Navajos present, because Navajo treaty negotiators had not yet been selected.

'Indian' for purposes of an exemption to a federal jurisdictional provision. But we recognized that a non-Indian could, by adoption, 'become entitled to certain privileges in the tribe, and make himself amenable to their laws and usages.' *Id.* at 573; see *Nofire v. United States*, 164 U.S. 657 (1897)." 495 U.S. at 694. The defendants in the *Nofire* case were "full-blooded Cherokee Indians," but the issue for federal criminal jurisdiction was whether Rutherford, the victim, was an "Indian." The court found that he was married to a Cherokee woman and thus he was a citizen under Cherokee law. Since he changed his "nationality" to that of the Cherokee Nation, he was under its exclusive jurisdiction and the defendants' convictions were reversed with instructions to surrender them to the Cherokee Nation.

The Supreme Court's endorsement of *Nofire* opens the doors to cases cited in that opinion and cases cited in the other opinions. For example, the *Duro* language is based upon Chief Justice Taney's observation in *United States v. Rogers* that someone "may by such adoption become entitled to certain privileges in the tribe, and make himself amenable to their laws and customs." 4 How. 567, 573. In the case of *In re Mayfield*, 141 U.S. 107 (1891), the Court ruled that under a provision of an 1866 Treaty, which recognized exclusive Cherokee Nation criminal jurisdiction over cases where parties were members "by nativity or adoption," an adopted nonmember defendant could not be tried for adultery in federal court. There were similar rulings in other federal criminal cases, *e.g. Alberty v. United States*, 162 U.S. 499 (1896), and *Lucas v. United States*, 163 U.S. 612 (1869).

We previously held, in *Navajo Nation v. Hunter*, 7 Nav. R. 194, 197-98 (1996), that the Navajo Nation has criminal jurisdiction over individuals who "assume tribal relations." How does that comply with the indications in the *Duro* decision that intermarriage alone does not constitute sufficient consent for criminal jurisdiction?

We have previously ruled that our 1997 Navajo Nation Criminal Code will be construed in light of Navajo common law, *Navajo Nation v. Platero*, 7 Nav. R. 422 (1991), and the Supreme Court approved *Navajo* common law in the *Wheeler* decision, 435 U.S. at 312-313. While there is a formal process to obtain membership as a Navajo, see 1 N.N.C. §§ 751-759 (1995), that is not the only kind of "membership" under Navajo Nation law. An individual who marries or has an intimate relationship with a Navajo is a *hadane* (in-law).[16] The Navajo People have *adoone'e* or clans, and many of them are based upon the intermarriage of original Navajo clan members with people of other nations. The primary clan relation is traced through the mother, and some of the "foreign nation" clans include the "Flat Foot-Pima clan," the "Ute people clan," the "Zuni clan," the "Mexican clan," and the "Mescalero Apache clan." See, *Saad Ahaah Sinil: Dual Language Navajo-English Dictionary*, 3-4 (1986). The list of clans based upon other peoples is not exhaustive. A *hadane* or in-law assumes a clan relation to a Navajo when an intimate relationship forms, and when that relationship is conducted within the Navajo Nation, there are reciprocal obligations to and from family and clan mem-

---

16. This was a specific consideration in the 1881 discussions of what to do about the Paiutes who entered the Navajo Nation.

bers under Navajo common law. Among those obligations is the duty to avoid threatening or assaulting a relative by marriage (or any other person).

We find that the petitioner, by reason of his marriage to a Navajo, longtime residence within the Navajo Nation, his activities here, and his status as a *hadane*, consented to Navajo Nation criminal jurisdiction. This is not done by "adoption" in any formal or customary sense, but by assuming tribal relations and establishing familial and community relationships under Navajo common law.

There is another aspect to consent by conduct. In *Tsosie v. United States*, 825 F.2d 393 (Fed. Cir. 1987), the Federal Circuit Court of Appeals discussed the "bad men among the Indians" language, saying that "[i]t is evident from the negotiations that the Navajos were not to be permanently disarmed, and could defend their reservation. They feared attacks by other Indian tribes, which they could repel, but pursuit and retaliation it was hoped they would refrain from, leaving that to the United States Army. The 'bad men' clause is not confined to United States Government employees, but extends 'to people subject to the authority of the United States.' This vague phrase, to effectuate the purpose of the treaty, could possibly include Indians hostile to the Navajos whose wrongs to the Navajos the United States will punish and pay for: thus the need for Indian retaliation would be eliminated." *Id.* at 396.

Avoidance of retaliation and revenge is clear in the Treaty of 1868. General Sherman urged Navajos to leave the neighboring Mexicans to the Army, but he told Navajos they could pursue Utes and Apaches who entered the Navajo homeland. The Treaty speaks to the admission of Indians from other Indian nations. The thrust of the "bad men" clause was to avoid conflict. We use a rule of necessity to interpret consent under our Treaty. It would be absurd to conclude that our *hadane* relatives can enter the Navajo Nation, offend, and remain among us, and we can do nothing to protect Navajos and others from them. To so conclude would be to open the door for revenge and retaliation. While there are those who may think that the remedies offered by the United States Government are adequate, it is plain and clear to us that federal enforcement of criminal law is deficient. Potential state remedies are impractical, because law enforcement personnel in nearby areas have their own law enforcement problems. We must have the rule of peaceful law rather than the law of the talon, so we conclude that the petitioner has assumed tribal relations with Navajos and he is thus subject to the jurisdiction of our courts.

## IV

Now we reach the issue of whether the petitioner is denied equal protection of the law because he, as a nonmember Indian, is placed in the classification "Indian" for criminal prosecution, along with Navajos, when non-Indians are not. The petitioner is mistaken as to the classification into which he falls. In *Navajo Nation v. Hunter*, 7 Nav. R. 194, we held that any person who assumes tribal relations is fully subject to our law, and that a person who assumes tribal relations is considered to

be an "Indian" and thus a "person" for purposes of 17 N.N.C. § 208(17) (1995). The petitioner belongs to the classification *hadane* and not that of nonmember Indian. One can be of any race or ethnicity to assume tribal relations with Navajos.[17]

Since the petitioner insists upon obtaining our ruling on the issue of equal protection, we must decide whether the classification of "nonmember Indian" is a political one or a "racial classification" subject to the strict scrutiny standard. We take our guidance from Chief Justice Burger's opinion in *United States v. Antelope*, 430 U.S. 641 (1977), which involved an Indian receiving a disparate penalty under federal criminal law compared to a smaller one under state law. The Supreme Court ruled that the differential treatment of Indians under the federal scheme does not violate equal protection of the law because Indians fall into a political and not a racial classification for purposes of equal protection.

Despite that, there is a fundamental governmental interest in prosecuting nonmember Indians. As mentioned, many Indians marry or enter into intimate relationships with Indians from other Indian nations, and this has been recognized for a long period of time. The Indian country crimes statute, 18 U.S.C. § 1152, does not distinguish between member and nonmember Indians. It provides: "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country. This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing an offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively." This is an old statute, dating from Section 25 of the Trade and Intercourse Act of June 30, 1834, 4 Stats. 29-35. We previously held that the Indian country crimes statute gives the Navajo Nation the authority to punish any Indian committing an offense in Indian Country. *Navajo Tribe of Indians v. Holyan*, 1 Nav. R. 78, 79 (1973).

There is an equal protection challenge the petitioner did not raise. It is that Navajos, as enrolled members of the Navajo Nation, are entitled to a wide range of benefits and non-Navajo *hadane* are not. In *Red Bird v. United States*, 203 U.S. 76 (1906), the "Cherokee Intermarriage Case," Cherokee law provided for two classes of membership. While it permitted whites to become citizens, subject to Cherokee jurisdiction, the Cherokee Nation changed its citizenship law in 1874 to provide that marriage would not give any right of soil or interest in vested Cherokee funds unless that person paid $500 as a pro rata share of the value of Cherokee lands. The Nation amended the law in 1877 to prohibit the acquisition of any right to soil or tribal lands through marriage. The Supreme Court

---

17. If there is any question about whether the petitioner or others have had a fair trial, all criminal defendants in our system have the option of seeking review in a United States District Court under a writ of habeas corpus. That review is on the record, just as appellate review in our system is on the record.

upheld the Cherokee law. *Id.* at 84.

We stress that the petitioner is treated no differently than he would be treated in a state or federal court in a criminal case. At oral argument, the petitioner's attorney was asked what sixth amendment rights his client is denied in our judicial system. He could not answer, because there is no difference. The ability to run for public office or to be a judge has utterly nothing to do with a fair criminal trial. Our rules of criminal procedure and our Navajo Nation Bill of Rights make no distinction as to race, ethnicity or membership in the Navajo Nation. The Navajo Nation courts keep no records on the race or ethnicity of any litigant and the justices and judges of our courts understand what equality before the law means. The Navajo Nation has a substantial interest in the welfare and safety of all within its boundaries and the Nation has an obligation to protect all from crime insofar as it can.

# V

We are unpersuaded by the petitioner's arguments. We return to the basic document which establishes relations between the United States of America and the Navajo Nation. It permitted Navajos to return to their homeland from a concentration camp on the Pecos River in eastern New Mexico. Navajos listened intently on May 28, 1868 when General Sherman explained that they could punish Indians of other nations who entered the Navajo Nation. At the time, oral communications were the primary mode for Navajos to transmit ideas, and our ancestors listened well and had good memories. They knew that they were to return to their own land to have jurisdiction over all their own activities. In fact, General Sherman said this about criminal jurisdiction on May 29, 1868 when the Navajos selected their negotiators and chose Barboncito as "Chief": "[N]ow from this time out you must do as Barboncito tells you, with him we will deal and do all for your good. When we leave here and get to your country you must obey him or he will punish you, if he has not the power to do so he will call on the soldiers and they will do it." Link at 7. Barboncito and his council knew what was expected of them, and in fact the Navajo treaty negotiators at Fort Sumner became the first Navajo police. The Navajo Nation has kept its word to its treaty ally, the United States of America. Accordingly, we call upon the United States of America to support its treaty ally and put to rest the problem of who has the power to deal with crime and social disruption.

We granted the petition for a writ of prohibition at the time of hearing as an alternative writ to require the Chinle District Court (the real party in interest) to defend through the Office of the Prosecutor. This Court finds that the Chinle District Court has jurisdiction under the Treaty of 1868, the petitioner has consented to criminal jurisdiction over him, and that he is not denied the equal protection of the law. Accordingly, a final writ is denied, and this cause is remanded to the Chinle District Court for a prompt trial.