UNITED STATES of America,
Plaintiff,

v.

Cody Cheyenne MEDEARIS,
Defendant.

No. CR. 02–30026.

United States District Court,
D. South Dakota,
Central Division.

Nov. 22, 2002.

Randolph J. Seiler Asst. U.S. Atty., Pierre, SD, for Plaintiff.

Bruce H. Ellison, Rapid City, SD, for Defendant.

### ORDER

Defendant filed a motion (Doc. 33) to dismiss the indictment and a motion to suppress evidence (Doc. 31). United States Magistrate Judge Moreno conducted an evidentiary hearing. A transcript (Doc. 84) has been prepared. I have read the transcript and all other applicable files and records herein. Judge Moreno served and filed a report and recommendations (Doc. 83). No objections have been filed and the time to object has expired. The report and recommendations should be adopted. The motion to dismiss should be

denied and the motion to suppress evidence should be granted. Now, therefore, based on a *de novo* review,

IT IS ORDERED, as follows:

1) The report and recommendations (Doc. 83) are adopted.

2) The motion to dismiss (Doc. 33) is denied.

3) The motion to suppress evidence (Doc. 31) is granted as to the government's case in chief.

## REPORT AND RECOMMENDATIONS FOR DISPOSITION OF DEFENDANT'S MOTIONS TO DISMISS AND TO SUPPRESS

MORENO, United States Magistrate Judge.

[¶ 1] Defendant, Cody Cheyenne Medearis (Medearis), filed Motions to Dismiss the Indictment and to Suppress Evidence on July 2, 2002. An evidentiary hearing concerning the Motions was later held on September 26, 2002. Because Medearis' Motions are dispositive ones, this Court is only authorized to determine the same on a report and recommendation basis. Pursuant to 28 U.S.C. § 636(b)(1), the Court does now make and propose the following Report and Recommendations for disposition of Medearis' Motions.

### I.

[¶ 2] Medearis, a 23–year–old college student (dob 12–25–78), is charged by Indictment with kidnapping (two counts) and aggravated sexual abuse (four counts).[1] The Indictment alleges that Medearis kidnapped and sexually assaulted Sherri Lynn Whiting, on or about January 13, 2002, in Todd County, South Dakota, in Indian country.[2]

[¶ 3] Following his arrest on the federal charges, Medearis made his initial appearance and was released on a third party custody basis. He was subsequently arraigned and pled not guilty to all six offenses.

[¶ 4] Thereafter, Medearis sought to dismiss the Indictment on the ground that his January 13, 2002 arrest by tribal officers was illegal. He also sought to suppress the evidence obtained by officers as the "fruit" of his illegal arrest. The Court scheduled and held a hearing on Medearis' dismissal and suppression Motions. At the hearing, four witnesses testified and five exhibits were received into evidence. After the hearing, Plaintiff, United States of America (Government) submitted supplemental authorities, which the Court has read and considered.

### II.

[¶ 5] Both of Medearis' Motions revolve around the propriety of his arrest on January 13, 2002, at the D & E Food and Fuel Convenience Store near Wood, South Dakota. That day Medearis was arrested by tribal officers from the Rosebud Police Department on a tribal charge. The Convenience Store, including the parking lot adjacent thereto where the arrest took place, is located on land owned by David and Eileen Larson. It is not clear, at this point, whether Medearis is an Indian or not; what is clear, however, is that if Medearis is an Indian, he is not an enrolled member of the Rosebud Sioux

---

**1.** Medearis is charged alternatively in the kidnapping and sexual abuse counts with being an Indian (in accordance with 18 U.S.C. § 1153) and a non-Indian (under 18 U.S.C. § 1152).

**2.** Todd County is located within the exterior boundaries of the Rosebud Indian Reservation. *See Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 596–615, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (holding that the 1889 Rosebud Reservation boundaries were diminished by subsequent congressional enactments and encompassed only Todd County).

Tribe.[3] The questions to be decided, when boiled down, are essentially two-fold:

1. Was Medearis' arrest illegal?

2. If so, does it require dismissal of the Indictment or suppression of the "fruits" obtained therefrom?

## III.

[¶ 6] Sometime during the early morning hours of January 13, 2002, Whiting was sexually assaulted. Grace Her Many Horses, a criminal investigator for the Rosebud Police Department, interviewed Whiting at the Indian Health Service (IHS) Hospital in Rosebud, South Dakota, shortly after the assault incident. There, Whiting disclosed that Medearis was the one who had assaulted her. After obtaining this and other information, Her Many Horses directed that a bulletin be put out for Medearis and that he be picked up for the assault.

[¶ 7] While driving around the housing area near Wood, South Dakota, Frank Vanderwalker, a Rosebud police officer, saw a vehicle parked at the D & E Convenience Store, which matched the description of the one Medearis was believed to be driving. Vanderwalker radioed Her Many Horses who told him to wait. When Her Many Horses arrived, Vanderwalker pointed out the vehicle to her. Her Many Horses then proceeded to the Convenience Store, followed by Vanderwalker, and stopped Medearis in the southeast portion of the Store parking lot. Her Many Horses identified herself to Medearis and arrested him on a tribal sexual assault charge. After being arrested, Medearis indicated, on two separate occasions, that he wanted a lawyer and twice asked if Whiting was all right (or used words to that effect). At this same time, Her Many Horses saw a rifle in the front seat of the vehicle, which she eventually removed, and took photographs of the interior and exterior of the vehicle. In the meantime, Medearis was handcuffed and transported by Vanderwalker to the Rosebud Jail. Upon completing her work at the parking lot, Her Many Horses called and had a wrecker tow Medearis' vehicle to the impound lot behind the Rosebud Police Department.

[¶ 8] While at the Jail, Medearis was directed to remove his clothing and did so. An attempt was made by Her Many Horses to interview him there, but Medearis again invoked his right to counsel and no questions were asked. Later that same day, Medearis was released on a $250 cash bond subject to various conditions.[4]

[¶ 9] The next day (January 14, 2002), Her Many Horses searched Medearis' vehicle and seized various items that were in the same. She also photographed the vehicle and the items that were found therein. At the time of the arrest, neither Her Many Horses nor Vanderwalker were in "fresh pursuit" of Medearis nor did any exigent circumstances exist. The arrest occurred on deeded land in a non-dependent Indian community off of the Rosebud Reservation.[5] The stop and arrest were made for a tribal offense, and not a state or federal one. No warrants were ever issued either for Medearis' arrest or for

---

**3.** On October 18, 2002, the Court contacted the Rosebud Tribe's enrollment office and was advised that Medearis is not a tribal member. The Court takes judicial notice of this fact pursuant to Fed.R.Evid. 201.

**4.** The cash bond Medearis signed prior to his release indicates that he was not charged with just one tribal offense (as Her Many Horses had told him), but rather, with five such offenses, namely, Aggravated Assault (Rosebud

Sioux Law and Order Code (RSTLOC) § 5–5–2), Kidnapping (RSTLOC § 5–6–1), Rape (RSTLOC § 5–7–1), Carrying a Concealed Weapon (RSTLOC § 5–11–5) and Possession of a Firearm/Dangerous Weapon While Intoxicated (RSTLOC § 5–11–7).

**5.** 18 U.S.C. § 1151 defines "Indian country" to include "all lands within the limits of any Indian reservation ..., all dependent Indian

the search of his vehicle nor were Miranda warnings ever given. Consent for the property and items that were searched and taken from Medearis was never sought or obtained.

[¶ 10] Her Many Horses and/or Vanderwalker admitted that:

(1) The Rosebud Police Department has no jurisdiction outside the Rosebud Reservation and its dependent Indian communities or over non-member Indians;

(2) The jurisdiction of tribal police officers is limited to the exterior boundaries of the Rosebud Reservation;

(3) The sexual assault charge they were looking for Medearis on was a tribal charge;

(4) Rosebud police officers can only arrest a person off of the Rosebud Reservation when they are in fresh pursuit of the person from the Reservation itself; and

(5) Tribal police have no authority to search, impound or seize a vehicle being driven by a non-member Indian on deeded land without fresh pursuit.

[¶ 11] Eventually, the evidence that was obtained from Medearis in connection with his arrest was turned over to the Federal Bureau of Investigation (FBI). On March 27, 2002, Medearis was indicted by a federal grand jury on the present kidnapping and sexual abuse charges. These charges stem from and arise out of his custodial arrest and the search and seizure of his vehicle and property on January 13–14, 2002.

## IV.

[¶ 12] A basic attribute of sovereignty is the power to enforce laws against all persons who come within the sovereign's territory. *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990); RSTLOC § 7–IV–B–7(g).[6] These authorities provide the analytical framework for determining whether Medearis was lawfully arrested and incarcerated and whether the Rosebud Tribe had criminal jurisdiction over him. *Oliphant* established that the inherent sovereignty of an Indian tribe does not extend to criminal jurisdiction over non-Indians who commit crimes on the reservation. 435 U.S. at 195–212, 98 S.Ct. 1011. *Wheeler* reaffirmed the long standing recognition of tribal jurisdiction over crimes committed by nonmembers. 435 U.S. at 316–332, 98 S.Ct. 1079. In *Duro,* the Supreme Court took the judicial divestiture of sovereignty enunciated in *Oliphant* one step further by holding that an Indian tribe could not assert jurisdiction over a non-member Indian defendant. 495 U.S. at 684–98, 110 S.Ct. 2053. Section 7–IV–B–7(g) codified the authority of Rosebud police officers to arrest a "person" if they are in "fresh pursuit" for conduct that occurred on the Reservation even if the arrest is made outside of the boundaries of the Reservation and its dependent Indian communities.[7]

communities within the borders of the United States ... and all Indian allotments ...."

6. This section of the Tribal Code reads as follows:

Any arresting officer:
May, if in fresh pursuit, continue such pursuit, and arrest upon capture the person pursued even if arrest would occur outside the exterior boundaries of the

Reservation. All persons so arrested may be returned to the Reservation by the arresting officer if the arresting occurs within the State of South Dakota. Otherwise, the arresting person will be turned over to local police officials pending extradition proceedings.

7. RSTLOC § 7–IV–B–5 is also instructive because it tells where tribal police may serve warrants and summonses, and by analogy,

[¶ 13]   If Medearis is a non-Indian, as is alleged in Counts II, IV and VI of the Indictment, Her Many Horses and Vanderwalker had no legal basis to arrest him on a tribal charge or require that he submit to the jurisdiction of the Rosebud Tribe.  *Oliphant*, 435 U.S. at 195, 212, 98 S.Ct. 1011.  If, however, it is assumed that Medearis is a non-member Indian, which is apparently what the Government charges in Counts I, III and V of the Indictment, the result is the same.  *See Duro*, 495 U.S. at 684–88, 110 S.Ct. 2053;[8] § 7–IV–B–5–7(g).

[¶ 14]   Medearis was arrested in Mellette, not Todd County.  Although dependent Indian communities exist in Mellette County, Medearis' arrest was not in such a community, but rather on privately owned land.  Nor were there any exigent circumstances present that would have justified Her Many Horses and Vanderwalker exceeding their territorial jurisdiction.  Medearis and his vehicle were parked and under surveillance while he was at the Convenience Store.  He had not been pursued there by either of the tribal officers, nor for that matter, even seen anywhere outside the Store's parking lot.  He was arrested as he started his car, drove around the back of the Store and was still in the parking lot.  He made no effort to evade officers or to flee.

[¶ 15]   From these facts, there can be little doubt that Medearis' custodial arrest was invalid.  Regardless of whether Medearis is a non-Indian or a non-member Indian, his arrest was unlawful under federal and tribal law.  This being the case,

the Court must now decide what the consequences, if any, should be for illegally arresting him.

V.

[¶ 16]   What is troublesome is that Her Many Horses and Vanderwalker had reasonable suspicion to stop Medearis and probable cause, but not jurisdictional authority, to arrest him.  A warrantless arrest executed outside an arresting officer's jurisdiction, however, is analogous to a warrantless arrest without probable cause.  *Ross v. Neff*, 905 F.2d 1349, 1353–54 (10th Cir.1990).   Absent hot pursuit or some kind of exigent circumstances, an extra-jurisdictional arrest is presumptively unreasonable.  *Ross*, 905 F.2d at 1354 & n. 6; *see also Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

[¶ 17]   Does this mean that Medearis' Motion to Dismiss should be granted on Fourth Amendment/jurisdictional grounds?  The answer is "no."

[¶ 18]   In *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), the Supreme Court indicated that the mere fact that a defendant has been arrested in violation of the Fourth Amendment did not affect the jurisdiction or power of the trial court to proceed with the criminal case and subject the defendant to trial.  Despite criticism, the Court has declined to retreat from the established rule that an illegal arrest or detention does not impair a Court's jurisdiction or right to put

---

make arrests.  This section of the Tribal Code defines the territorial parameters of authority as "anywhere within the exterior boundaries of the Rosebud Indian Reservation, i.e., Todd County, South Dakota."

8.   While it is true that Congress amended the Indian Civil Rights Act (ICRA) in an attempt to "legislatively override" *Duro, see United*

*States v. Archambault*, 174 F.Supp.2d 1009, 1019–20 (D.S.D.2001) (Archambault I); *United States v. Archambault*, 206 F.Supp.2d 1010, 1014 (D.S.D.2002) (Archambault II), these amendments did not clothe Her Many Horses and Vanderwalker with the power to arrest Medearis on deeded land absent fresh pursuit or some other kind of exigent circumstances.

the defendant on trial and convict him for the offense he was arrested on. *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); *United States v. Alvarez–Machain,* 504 U.S. 655, 659–70, 112 S.Ct. 2188, 119 L.Ed.2d 441.[9] In doing so, the Court explained that the "body" of the defendant in a criminal case is never itself suppressible as a "fruit" of an unlawful arrest. *Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 1039, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); *Crews,* 445 U.S. at 474, 100 S.Ct. 1244. The Court, however, acknowledged that the "general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated." *Lopez–Mendoza,* 468 U.S. at 1040–41, 104 S.Ct. 3479.

■ [¶ 19] It therefore appears that the unconstitutionality of an arrest, unlike that of a search, is in itself of little use to Medearis. Except in a very few cases of shocking and violent police conduct,[10] not present here, Medearis may be tried and convicted of one of the three sets of charges he now faces even though his arrest was made in violation of the Fourth Amendment. Accordingly, Medearis' Motion to Dismiss must be denied.

## VI.

[¶ 20] Whether the evidence tribal officers obtained from Medearis as a result of his illegal custodial arrest can be used at trial in his federal prosecution is, however, an entirely different matter. The admissibility of such evidence turns on the exclusionary rule and several well recognized exceptions to it.

■ [¶ 21] The exclusionary rule, a judge-made doctrine, prohibits the prosecution from using evidence, obtained in violation of a defendant's constitutional rights, as direct proof of the defendant's guilt. *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The rationale behind the rule is two-fold. First, exclusion will act as a deterrent to violations of the Constitution, since in many cases the police will have no motive to conduct an unlawful search, interrogation, etc., if they know that they will not be able to use its fruits as evidence. Second, the integrity of the judicial system requires that courts not be made a "party to lawless invasions of constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions."

9. *See also Scrivner v. Tansy,* 68 F.3d 1234, 1241 ( 10th Cir.1995) (*Ker–Frisbie* applies even if the New Mexico officers arrested the defendant in Arizona without a warrant and then transported him to New Mexico for trial), *cert. denied,* 516 U.S. 1178, 116 S.Ct. 1277, 134 L.Ed.2d 223 (1996); *State v. Spotted Horse,* 462 N.W.2d 463, 468 (S.D.1990) (applying the *Ker–Frisbie* rule and holding that the State had jurisdiction to try an Indian who committed an off-reservation misdemeanor, but fled to the reservation and was arrested there by a municipal police officer), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991); *accord Primeaux v. Leapley,* 502 N.W.2d 265, 270 (S.D.1993) ("It is established law in this state that even an illegal arrest does not render a subsequent conviction void").

10. *See United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974); *United States ex rel Lujan v. Gengler,* 510 F.2d 62 (2d Cir.1975); *see also United States v. Chapa–Garza,* 62 F.3d 118 (5th Cir.1995) (mere circumvention of pending extradition proceedings are insufficient as *Toscanino* is "limited to those situations involving torture, brutality and similar outrageous conduct").

*Terry v. Ohio,* 392 U.S. 1, 13, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

[¶ 22] The exclusionary rule applies to evidence which is obtained as a direct result of the violation of a defendant's rights. Thus, if the seizure of evidence from a defendant's vehicle is in violation of her Fourth Amendment rights, its admission against her is barred.

[¶ 23] The rule also applies to evidence that is "secondary" or "derivative" in character—for example, where an illegal custodial arrest results in a defendant making incriminatory statements and the police seizing items of property. When such evidence is involved, it is necessary to determine whether the evidence is "tainted" by a prior constitutional violation. To borrow from Justice Felix Frankfurter, it must be decided whether the evidence is the "fruit of the poisonous tree." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). As the example above demonstrates, the "poisonous tree" can be an illegal arrest or search.

[¶ 24] In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) the Supreme Court said that the question to be answered as to derivative evidence is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 488, 83 S.Ct. 407 (quoting Maguire, *Evidence of Guilt,* 221 (1959)). The rule in *Wong Sun* is clear: evidence should not be excluded simply because it comes to light as a result of some prior illegality; rather, such evidence, the knowledge of which is obtained as a result of the illegality, is admissible if (1) it is not thereafter obtained through exploitation of the illegality, or (2) it has been subsequently obtained by means sufficiently distinguishable from the prior ille-

gality to "purge" the evidence of the "taint."

[¶ 25] Here, all of the evidence obtained by tribal officers from Medearis and used by the Government in the prosecution of him is directly traceable to and was derived from his illegal custodial arrest. Does this mean that the evidence should be suppressed under the exclusionary rule? The Government contends that all of the evidence is admissible under one or more exceptions to the rule or, at a minimum, as impeachment in the event Medearis testifies at trial.

[8, 9] [¶ 26] In *Nardone,* the Supreme Court established the doctrine of "attenuation" by recognizing that the evidence sought to be excluded might be admissible if the link between the illegal conduct and the evidence was found to have become so attenuated as to dissipate the taint. *See United States v. Ceccolini,* 435 U.S. 268, 273–80, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *see also United States v. Reinholz,* 245 F.3d 765, 779 (8th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 218, 151 L.Ed.2d 155 ( 2001); *Hamilton v. Nix,* 809 F.2d 463, 465–66 (8th Cir.) (en banc), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987). The question of attenuation is largely a matter of degree and thus the application of the test is dependent upon the factual circumstances of each case. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

[¶ 27] The *Wong Sun* Court, quoting from *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), observed that the "exclusionary rule has no application" when the "Government learned of the evidence 'from an independent source.' " 371 U.S. at 487, 83 S.Ct. 407. In *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the Court reaffirmed

that the "independent source" doctrine applied "to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities tainted by the initial illegality." *See Segura v. United States,* 468 U.S. 796, 814–16, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (evidence seized under a valid search warrant, based on evidence obtained before the illegal entry into the defendant's home was admissible because the same was derived from an independent source); *see also Reinholz,* 245 F.3d at 769; *Hamilton,* 809 F.2d at 465–67. Using the facts in *Murray* as an example, bags of marijuana first seen by police during an illegal warrantless search may, when later seized pursuant to a warrant, have an independent source in the warrant—provided that neither the decision to seek the warrant nor the decision to issue it was influenced by the earlier illegality. *See United States v. Markling,* 7 F.3d 1309, 1315 (7th Cir.1993) (under *Murray,* if police discover items × and y during an illegal search, but then in a later "untainted" legal search discover not only item z, but rediscover items × and y, × and y as well as z are admissible), *cert. denied,* 514 U.S. 1010, 115 S.Ct. 1327, 131 L.Ed.2d 206 (1995). The problem, of course, is once the cat is out of the bag, there is no way to put it back in. The question courts must wrestle with, then, is whether the entire investigation that flowed from the prior illegality is tainted or whether knowledge of the evidence was gained from an independent source that had nothing to do with the original illegality.

■ [¶ 28] Another exception to the exclusionary rule is the so-called "inevitable discovery" doctrine. This exception, which was adopted by the Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), is similar to the "independent source" exception. The former differs from the latter, however, in that the question is not whether the police

acquired the challenged evidence by relying on an untainted source, but rather, whether the evidence that was found, because of an earlier illegality, would have inevitably been discovered by lawful means. *See Reinholz,* 245 F.3d at 779. Significantly, the Court in *Nix* refused to require that the prosecution prove an absence of bad faith as a condition to utilizing the "inevitable discovery" exception. 467 U.S. at 445–46, 104 S.Ct. 2501.

■ [¶ 29] Even if evidence is suppressed under the exclusionary rule, it may nevertheless be used to impeach a defendant who chooses to take the witness stand in his own defense. *United States v. Havens,* 446 U.S. 620, 627–28, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); *Walder v. United States,* 347 U.S. 62, 64–65, 74 S.Ct. 354, 98 L.Ed. 503 (1954); *see also James v. Illinois,* 493 U.S. 307, 311–13, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990). This applies not only to tangible or documentary evidence, *Havens,* 446 U.S. at 627–28, 100 S.Ct. 1912, but also to the voluntary and uncoerced statements made by a defendant, *Oregon v. Hass,* 420 U.S. 714, 720–24, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 223–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

### A.

■ [¶ 30] Immediately after being placed under arrest for sexual assault, Medearis inquired of Her Many Horses whether Whiting was all right. His statement, which he made twice, inculpated him in Whiting's assault. The statement, however, was voluntary and not the product of any flagrant misconduct on the part of Her Many Horses or Vanderwalker. Even so, the statement was made moments after and on the heels of the illegal arrest and while Medearis was in the process of being handcuffed. He was never given any Miranda warnings and, much like the initial

statement made in *Wong Sun*, there were no intervening circumstances present that purged the taint of the unlawful custodial arrest. Nor was there any factual foundation laid that would exempt the statements from the exclusionary rule. On this record, the statement is an unprotected poisonous fruit that is inadmissible in the Government's case in chief. *Brown*, 422 U.S. at 603–05, 95 S.Ct. 2254; *Dunaway v. New York*, 442 U.S. 200, 217–18, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *see also Reinholz*, 245 F.3d at 779–80.

### B.

[¶ 31] Shortly after arriving at the Rosebud Jail, Vanderwalker obtained Medearis' clothes from him. The Government suggests that this was done with Medearis' consent, but the totality of the circumstances do not establish, in this Court's view, that his "consent" was voluntary and not the product of duress or coercion, express or implied. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *Reinholz*, 245 F.3d at 780–81.[11] Because Medearis never voluntarily (and thus lawfully) consented to giving Vanderwalker his clothing, the "taint" from the illegality was never purged and had no time to dissipate. The seizure of Medearis' clothes was the direct result of an illegal custodial arrest less than an hour earlier, and the exploita-

tion, by tribal police, of the same. *United States v. Belcher*, 288 F.3d 1068, 1071 (8th Cir.2002); *United States v. Guevara–Martinez*, 262 F.3d 751, 755–56 (8th Cir.2001); *Reinholz*, 245 F.3d at 780–81.[12] To suggest, or even intimate, that the "independent source and/or inevitable discovery" exceptions to the exclusionary rule are applicable and preserve the admissibility of Medearis' clothing is ludicrous and not supported by the facts of the case. Instead, the clothing is subject to the sanctions of the rule and must be suppressed.

### C.

[¶ 32] At the scene of the arrest, Her Many Horses removed a rifle sitting between the two front seats of Medearis' vehicle and took pictures of the interior and exterior of the vehicle. The next day, Her Many Horses conducted an inventory search of the vehicle and seized various items, such as broken zipper parts, beer, bullets, a belt, money, cigarettes, zig-zag papers and tire irons. Her Many Horses also took additional pictures of the vehicle, both inside and out, and of items that were seized from the vehicle.

[¶ 33] The pathway from Medearis' arrest to the search and seizure of the vehicle and items contained in it was straight and uninterrupted. The taint of

---

11. In making this determination, the Court is mindful of the Supreme Court's decision in *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). There, the defendant was arrested in a restaurant, taken out on the street, searched, given Miranda warnings then asked permission to search his nearby car, which was granted. 423 U.S. at 412–13, 96 S.Ct. 820. The Court held that although defendant was in custody, his consent was voluntary. *Id.* at 424–25, 96 S.Ct. 820. The *Watson* Court's decision was motivated partly by the fact that although the defendant was not told he could refuse consent to the vehicle search, the arresting officer did tell him that "if I find anything, it is going

to go against you", a paraphrase of the earlier given Miranda warnings. *Id.* at 413, 424–25, 96 S.Ct. 820. Also, the defendant gave his consent in a public street, not while in jail. *Id.* at 424, 96 S.Ct. 820.

By contrast, Medearis, following his arrest, was handcuffed and transported for 35 to 40 minutes by a uniformed officer to the Rosebud Jail and directed to take his clothes off and give them to the officer.

12. It should be noted that the Court's decision, with respect to the consent issue, was arrived at after consideration and application of the factors set forth in *Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254.

the unlawful arrest was neither attenuated nor purged by any intervening factors. At no time did tribal police ever Mirandize Medearis or obtain a search warrant or consent from him. Nor has any satisfactory showing been made that tribal officers would have been able to actually acquire the evidence they seized and took pictures of (in the same or similar condition in which it was taken) by following up on leads and other information wholly unconnected with the initial custodial arrest. Similarly, despite its efforts, the Government has failed to convincingly establish that all of the vehicle evidence that was seized and photographed, would have inevitably been discovered by police in the same or similar condition within 24 hours of the arrest, or even at all. There being no exceptions available to excuse or otherwise purge the taint of the prior illegality, the seizure of Medearis' vehicle and the items in it, as well as the photographs taken of the same, are all "fruits" of a poisonous tree and must be excluded as evidence. *Belcher*, 288 F.3d at 1071; *United States v. Jones*, 269 F.3d 919, 929 (8th Cir.2001); *see also United States v. Ienco*, 182 F.3d 517, 525–29 (7th Cir.1999) (where the government failed to show how the connection between the initial illegal arrest and the evidence found in the defendants' van was severed, suppression of evidence under the exclusionary rule was appropriate); *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir.1994) (stating that physical evidence obtained as a result of an illegal detention is not admissible), *cert. denied*, 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995).

## VII.

[¶ 34] The fact that Her Many Horses and Vanderwalker acted in good faith belief that they had the authority to arrest and incarcerate Medearis does not serve to vitiate the search and seizure that followed.[13] The Supreme Court has never applied the "good faith" or "objectively reasonable belief" exception to the exclusionary rule in this context. The rule, as previously indicated, was created in part to help deter constitutional violations. The most important factor when analyzing the deterrent effect is whether application of the rule to a particular fact situation is needed in order to alter the behavior of law enforcement officers. Here, Her Many Horses and Vanderwalker could (and should) have stopped and detained Medearis, instead of arresting and incarcerating him, to determine his status and whether the Convenience Store was in Indian country and within the jurisdiction of the Rosebud Tribe. *Duro*, 495 U.S. at 697, 110 S.Ct. 2053 ("[w]here jurisdiction to try and punish an offender rests outside the tribe, the tribal officers may exercise their power to detain the offender and transport him to the proper authorities"), *United States v. Patch*, 114 F.3d 131, 134 (9th Cir.) (county deputy sheriff had authority under *Terry* to stop and detain motorist to determine tribal membership with respect to alleged traffic offense within reservation), *cert. denied*, 522 U.S. 983, 118 S.Ct. 445, 139 L.Ed.2d 381 (1997); *State v. Horseman*, 263 Mont. 87, 866 P.2d 1110, 1115 (1993) (tribal officer had inherent authority to stop and detain non-member until state officer could be summoned); *State v. Schmuck*, 121 Wash.2d 373, 850

---

**13.** It appears that the "good faith" exception has been applied by the Supreme Court in only two situations: (1) where the police rely on a search warrant that is later found to have been unconstitutional either because it was issued without probable cause or because it was facially defective; and (2) where the police rely on what they think is an outstanding arrest warrant, that is later found not to be outstanding at all, and in the course of the arrest perform a search that results in the seizure of evidence.

P.2d 1332, 1337 (tribal police, while not cross deputized or otherwise commissioned by the state, have the authority to stop and detain non-Indians), *cert. denied,* 510 U.S. 931, 114 S.Ct. 343, 126 L.Ed.2d 308 (1993); *see also Strate v. A-1 Contractors,* 520 U.S. 438, 456, n. 11, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) ("where the Court did not question the authority of tribal police to patrol roads within a reservation, including rights-of-way made part of the state highway, and to detain and turn over to state officers non-members stopped on the highway for conduct violating state law"). The Court can see no logical reason for extending the "good faith" exception in this case, especially where tribal police officers had other, lesser restrictive, options available to them that they could have employed.

## VIII.

[¶ 35] The fact that tangible evidence and a defendant's statements have been suppressed does not necessarily prevent them from being used as impeachment at trial if and when the defendant himself testifies. The rationale for allowing tainted evidence to be used as impeachment is simple: if the defendant takes the witness stand and gives testimony that is inconsistent with his own previously recorded statements or other evidence, the Constitution does not require the Government to leave the lie unchallenged for to do so would permit the defendant to use the law as a means of effectuating perjury. *United States v. Baftiri,* 263 F.3d 856, 857 (8th Cir.2001); *see also United States v. Rowley,* 975 F.2d 1357, 1361 (8th Cir.1992).

▉ [¶ 36] In the instant case, Medearis' statements to Her Many Horses were voluntary and not the product of coercion. Such statements, therefore, are admissible to impeach his trial testimony. *Hass,* 420 U.S. at 720–24, 95 S.Ct. 1215; *Harris,* 401 U.S. at 223–26, 91 S.Ct. 643.

[¶ 37] The same is true with respect to the tangible evidence seized from Medearis (i.e. his clothes, vehicle and items located therein) as well as the various photographs Her Many Horses took of the vehicle and of items seized from it. *Havens,* 446 U.S. at 627–28, 100 S.Ct. 1912. The Court can see no reason why *Havens* and its progeny should not apply and permit the use of this tangible evidence for impeachment purposes.

## IX.

[¶ 38] Based on the foregoing and in accordance with § 636(b)(1), it is hereby

[¶ 39] RECOMMENDED that Medearis' Motion to Dismiss, Docket No. 33, be denied in its entirety and with prejudice. It is further

[¶ 40] RECOMMENDED that Medearis' Motion to Suppress Evidence, Docket No. 31, be granted and that all tangible evidence and statements obtained by tribal officers on January 13–14, 2002 following his arrest, be excluded at trial as substantive evidence of guilt.

## NOTICE

**Failure to file written objections to the within and foregoing Report and Recommendations for disposition within 10 days from the date of service shall bar an aggrieved party from attacking such Report and Recommendations before the assigned United States District Judge.** *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72.

October 28, 2002.